Stephen F. WILDER, Brendan Gill, Imre J. Rosenthal, Stephen Rosenthal, Robert Neuwirth, Lori Jean Saich, and the Whitby Tenants' Association, Plaintiffs–Appellants,

v.

Lee M. THOMAS, as Administrator of the United States Environmental Protection Agency, United States Environmental Protection Agency; Region II of the United States Environmental Protection Agency; New York State Urban Development Corporation; Vincent Tese, as Chairman of the New York State Urban Development Corporation; Times Square Redevelopment Corporation; Carl Weisbrod, as President of the Times Square Redevelopment Corporation; New York State Department of Environmental Conservation; Henry G. Williams, as Commissioner of the New York State Department of Environmental Conservation; Department of Environmental Protection of the City of New York; Harvey W. Schultz, as Commissioner of the Department of Environmental Protection to the City of New York; Mario M. Cuomo, as Governor of the State of New York; and Edward I. Koch, as Mayor of the City of New York, Defendants–Appellees.

No. 288, Docket 87–7516.

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1987.

Decided Aug. 10, 1988.

Jacob Friedlander, New York City (Le-Boeuf, Lamb, Leiby & MacRae, John S. Kinzey, Jonathan E. Polonsky, Stephen Orel, Steven R. Lazar; Norman Dorsen, New York City, of counsel), for plaintiffs-appellants.

Stephen Kass, New York City (Berle, Kass & Case, Jean M. McCarroll, David A. Hansell, Joanne M. Gentile, Gail S. Port, Joseph C. Petillo, of counsel), for defendants-appellees New York State Urban Development Corp.

Peter L. Zimroth, New York City (Corp. Counsel of the City of New York, Leonard Koerner, Fay Leoussis, of counsel), for New York City defendants-appellees.

Robert Abrams, New York City, Atty. Gen. of the State of New York (John Proudfit, C. Michael Bryce, Asst. Attys. Gen. of the State of New York, of counsel), for defendants-appellees New York State Department of Environmental Conservation, Henry G. Williams and Mario M. Cuomo.

Before FEINBERG, Chief Judge, OAKES, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This appeal arises from the most recent in a long series of actions that have been brought in state and federal courts by these plaintiffs and others similarly situated, who seek to forestall construction of the proposed 42nd Street Development Project ("the project") in New York City. The facts surrounding the impetus for the project and the complex procedural machinations that have accompanied the planning stages are described in *Jackson v. N.Y. State Urban Dev. Corp.*, 67 N.Y.2d 400, 503 N.Y.S.2d 298, 494 N.E.2d 429 (1986), *aff'g* 110 A.D.2d 304, 494 N.Y.S.2d 700 (1st Dep't 1985). The goal of the project is to eliminate "physical, social and economic blight" in the Times Square area, *Rosenthal & Rosenthal, Inc. v. N.Y. State Urban Dev. Corp.*, 771 F.2d 44, 45 (2d Cir.1985) (citing *Natural Resources Defense Council, Inc. v. City of New York*, 672 F.2d 292, 294 (2d Cir.), *cert. dismissed*, 456 U.S. 920, 102 S.Ct. 1963, 72 L.Ed.2d 462 (1982)), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986). After extensive study and review pursuant to state statute, the City of New York, the New York State Urban Development Corporation ("UDC"), its subsidiary, the Times Square Redevelopment Corporation, and various private developers have decided that this goal will be achieved by the construction of four office towers, a hotel, eight renovated theatres, a wholesale mart, restaurants, retail spaces, and a renovated subway station. *See Jackson*, 503 N.Y.S. 2d at 302–03, 494 N.E.2d at 433–34. The project area has been divided into twelve sites between 40th and 43rd streets.

Opposition to the project by area business owners and residents, historical preservationists, and environmentalists has so far produced more than two dozen actions against the project. Residents fear that they will be driven out by skyrocketing property values; environmentalists claim

that the project will exacerbate traffic congestion, thereby increasing levels of air pollution; others seek to preserve landmark theatres from demolition. There have already been unsuccessful challenges under the antitrust laws, *Cine. 42nd St. Theatre Corp. v. Nederlander Org.,* 609 F.Supp. 113 (S.D.N.Y.1985), *aff'd,* 790 F.2d 1032 (2d Cir.1986); on first amendment, due process and equal protection grounds, *G & A Books v. Stern,* 604 F.Supp. 898 (S.D.N.Y.), *aff'd,* 770 F.2d 288 (2d Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); as an allegedly unconstitutional exercise of the eminent domain power, *Rosenthal & Rosenthal, Inc. v. N.Y. State Urban Dev. Corp.,* 605 F.Supp. 612 (S.D.N.Y.), *aff'd,* 771 F.2d 44 (2nd Cir.1985); and under New York City's Uniform Land Use Review Procedure, *Rosenthal & Rosenthal, Inc. v. New York City Bd. of Estimate,* 114 A.D.2d 1054, 495 N.Y.S.2d 549, *aff'd,* 67 N.Y.2d 349, 502 N.Y.S.2d 707, 493 N.E.2d 931 (1986).

In addition to filing two of the aforementioned suits, the plaintiffs in this case (except Brendon Gill and the Whitby Tenants' Association) also brought a proceeding under Article 78 of New York's C.P.L.R. There they challenged UDC's compliance with the State Environmental Quality Review Act ("SEQRA") in analyzing the environmental impact of the proposed project. *See Rosenthal v. New York State Urban Dev. Corp.,* 110 A.D.2d 304, 494 N.Y.S.2d 700 (1st Dep't 1985), *aff'd,* 67 N.Y.2d 400, 503 N.Y.S.2d 298, 494 N.E.2d 429 (1986) (consolidated with *Jackson v. New York State Urban Dev. Corp.*). They focus particularly on perceived problems with levels of carbon monoxide in the Times Square area.

Plaintiffs discontinued the action against three federal defendants who were named in the original complaint in this case. An order dismissing the action as to those defendants was entered on July 28, 1986.

Plaintiffs appeal from a judgment of the United States District Court for the Southern District of New York, Thomas P. Greisa, *Judge,* that dismissed their action brought under the citizen suits provision of the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., on the ground that the proposed amended complaint failed to state a claim. Plaintiffs alleged that defendants violated requirements of the CAA relating to transportation control measures set out in New York State's implementation plan, which was adopted pursuant to CAA § 7410. In essence, plaintiffs claim that construction of the project will lead to further violations of the CAA, and they seek an injunction against construction of the project.

## I. BACKGROUND

Plaintiffs rely in particular on § 7604(a) which provides, in pertinent part, that "any person may commence a civil action on his own behalf * * * against any person * * * [or] governmental instrumentality or agency * * * who is alleged to be in violation of * * * an emission standard or limitation under this chapter". 42 U.S.C. § 7604(a)(1)(A). "Emission standard or limitation" is defined as including "any condition or requirement under an applicable implementation plan relating to transportation control measures", § 7604(f)(3). A citizen may also commence a civil action against the administrator of the Environmental Protection Agency ("EPA") where the administrator fails to perform any nondiscretionary duty under the CAA. § 7604(a)(2).

### A. Statutory Schemes.

Because implementation of the act involves a complex interplay of state and federal responsibilities, *see Concerned Citizens of Bridesburg v. Envtl. Protection Agency,* 836 F.2d 777, 779 (3d Cir.1987); *Connecticut v. Envtl. Protection Agency,* 696 F.2d 147, 151 (2d Cir.1982); *Council of Commuter Orgs. v. Gorsuch,* 683 F.2d 648, 651 (2d Cir.1982), it is necessary to examine the procedural requirements of both the state and federal statutory environmental protection schemes and the extent to which the defendants have, insofar as the planning of the project is concerned, complied with these requirements.

SEQRA, enacted in 1975 and codified as N.Y. Envtl. Conserv. Law § 8–0101 et seq. (McKinney 1984), was designed, in part, to fill a gap left by the National Environmental Policy Act, 42 U.S.C. §§ 4321, 4332 et seq., which imposed an obligation on federal agencies to consider the environmental consequences of federally funded or approved projects. A key provision in SEQRA is the requirement that state and local agencies prepare an environmental impact statement ("EIS") on any action they propose or approve that "may have a significant effect on the environment." N.Y. Envtl. Conserv. Law § 8–0109.2. *See* 503 N.Y.S.2d at 303–04, 494 N.E.2d at 434–35. The purpose of the EIS "is to provide detailed information about the effect which a proposed action is likely to have on the environment, to list the ways in which any adverse effects of such an action might be minimized, and to suggest alternatives to such an action so as to form the basis for a decision whether or not to undertake or approve such action." N.Y. Envtl. Conserv. Law § 8–0109.2.

The CAA was designed to prevent and control air pollution by providing "Federal financial assistance and leadership * * * for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution." 42 U.S.C. § 7401(a)(3), (4). The CAA amendments of 1970, Pub. L. No. 91–604, 84 Stat. 1679 (1970), *amended by* Pub. L. 95–95, Title I, § 106, 91 Stat. 691 (1977), required the EPA to promulgate national ambient air quality standards ("NAAQS") for various air pollutants, including carbon monoxide. *See* § 7409 (National Primary and Secondary Air Quality Standards); 40 C.F.R. § 50.8 (1987); *Council of Commuter Orgs. v. Gorsuch*, 683 F.2d at 651. The NAAQS for carbon monoxide is "9 parts per million * * * for an 8–hour average concentration not to be exceeded more than once per year." 40 C.F.R. § 50.8(a)(1) (1987).

Section 7410(a)(1) requires that each state adopt an implementation plan ("SIP") that provides for the "implementation, maintenance, and enforcement of national primary and secondary ambient air quality standards". *See Concerned Citizens of Bridesburg*, 836 F.2d at 780–81; *see generally* 683 F.2d at 651 (discussing SIP revision process for nonattainment areas). The administrator is required to approve or disapprove a proposed SIP within four months after it is submitted, based on criteria set out in § 7410(a)(2). Thus, the EPA "determines the ends—the standards of air quality—while the states are given the initiative and broad responsibility to achieve those ends." *Concerned Citizens of Bridesburg*, 836 F.2d at 779 (citation omitted).

The 1977 amendments to the CAA extended the deadline for attainment of carbon monoxide and ozone standards in certain "nonattainment states", including New York. *See* 42 U.S.C. § 7502(a)(2); 683 F.2d at 651. Pursuant to these amendments, "extension states" were required to submit SIP revisions containing measures stringent enough to assure attainment of the NAAQS by December 31, 1987. *See* § 7502(c); 683 F.2d at 651. The December 31, 1987, federal statutory deadline was in effect when the complaint leading to this appeal was filed.

In a continuing appropriations bill, Joint Resolution 395, Pub. L. No. 100–202 (Jan. 6, 1987), congress approved legislation that prohibits the EPA from imposing, prior to August 31, 1988, sanctions on areas that fail to attain the NAAQS for carbon monoxide by December 31, 1987. *See generally* 42 U.S.C. § 7413 (Federal enforcement procedures); *Council of Commuter Orgs. v. Gorsuch*, 683 F.2d at 651 (discussing treatment of "nonattainment areas" under Clean Air Act amendments of 1977). Although this amendment, in effect, extends the deadline for attainment of the NAAQS in New York City to August 31, 1988, the SIP that was in effect when plaintiffs brought this suit has not been modified and still contains a commitment that "all [carbon monoxide] hot spots will be eliminated by the end of 1987." New York State Air Quality Implementation Plan for Control of Carbon Monoxide and Hydrocarbons in New York City Metropolitan Area § 3.5.3, at 3–21 (Future Action) (revised January 1984). A "hot spot" is "any location which has been shown to have a potential to vio-

late [the NAAQS] for carbon monoxide as of December, 1982." *Id.* at § 3.3.

The provisions of the SIP are crucial to this appeal because plaintiffs bringing a citizen suit "must allege a violation of a specific strategy or commitment in the SIP and describe, with some particularity, the respects in which compliance with the provision is deficient." *Council of Commuter Orgs. v. Metro. Transp. Authority,* 683 F.2d 663, 670 (2d Cir.1982). *See Action for Rational Transit v. Westside Highway,* 699 F.2d 614, 616 (2d Cir.1983).

The 1984 SIP was submitted pursuant to that portion of § 7410 that allows states to include provisions for review of "indirect sources". An "indirect source" includes structures that "may attract mobile sources of pollution", 42 U.S.C. § 7410(a)(5)(C), presumably cars, buses, etc. Under an "indirect source review program", the state may provide for a review of indirect sources of air pollution and for the development of measures that will "assure, or assist in assuring," that a new or modified indirect source will not lead to nonattainment of the NAAQS or prevent the maintenance of the NAAQS. 42 U.S.C. § 7410(a)(5)(D).

In exercising its discretion under the CAA to include an indirect source review program in its SIP, the state chose to use the SEQRA EIS process as the means by which the environmental impact of an indirect source would be evaluated. The 1984 SIP, which was approved by the EPA in 1985, *see* 40 C.F.R. § 52.1673(a), provides that "[t]he primary mechanism for comprehensive evaluation of major projects which may have a significant impact on air quality is the environmental impact statement (EIS). EIS's are required by either the National Environmental Policy Act (NEPA), the State Environmental Quality Review Act (SEQRA), or the New York City Environmental Quality Review (CEQR)." 1984 SIP at § 3.6 (Changing Traffic Patterns). SEQRA, in turn, requires that, in preparing an EIS, agencies "choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practica-

ble, minimize or avoid adverse environmental effects, including effects revealed in the environmental impact statement process." N.Y. Envtl. Conserv. Law § 8–0109.1 (McKinney 1984). Thus, project approval was subject to the indirect source review program that New York voluntarily included in the 1984 SIP, which it adopted pursuant to CAA requirements. The SEQRA EIS process was the mechanism that the UDC used to evaluate the potential impact of the project on air quality.

**B.** *Project Approval.*

In this case, UDC, as the lead agency for the project, *see* N.Y. Envtl. Conserv. Law § 8–0111.6; 6 N.Y. Comp. Code Rules & Regs. tit. 6, § 617.6, prepared a draft EIS, held public hearings, received and reviewed written and oral public comments, revised the EIS, and published a final EIS. *See* 6 N.Y. Comp. Code Rules & Regs. tit. 6, § 617.8 (Environmental impact statement procedures); 503 N.Y.S.2d at 304, 494 N.E. 2d at 435. After considering "social, economic and other factors", as well as relying on the final EIS, UDC approved the project on October 4, 1984, and set forth its findings and conclusions pursuant to SEQRA and part 617 of the New York Code of Rules and Regulations. *See* N.Y. State Urban Dev. Corp., *Findings With Respect to 42nd Street Development Project, New York, New York,* Oct. 4, 1984, at 1, 43–44 [hereinafter cited as UDC Report]. The portions of the UDC report that are most important for our purposes concern (1) existing air quality and the projected impact of the project on air quality and (2) mitigation of traffic and air quality impacts.

Under "Existing Project Area Conditions", that is, the conditions that prevailed in 1984, long before any construction was to begin, UDC found that "under adverse meteorological and traffic conditions, the [carbon monoxide] standard for the peak eight-hour period of the day (average of 9 parts per million (ppm) per hour) is exceeded at ten of the eleven project area receptor locations". UDC Report at 15–16.

Under "Project Impacts", that is, the overall effect after the project is complet-

ed, UDC concluded that "without traffic mitigations, violations of the eight-hour carbon monoxide standard of 9 ppm would occur at several locations in 1991 under peak traffic and meteorological conditions", but that with mitigation, carbon monoxide concentrations within the project area would, depending on the exact location, either (1) be below the 9 ppm standard; (2) exceed the 9 ppm standard by only de minimis amounts (*i.e.*, 9.3 ppm); or (3) be lower than would be the case without the project. UDC Report at 26–27.

UDC made similar findings regarding impacts during project construction: without mitigation the 9 ppm standard would be exceeded in a number of project area locations during construction, but with mitigation measures, two locations at most would exceed the 9 ppm standard during temporary traffic diversion. At one of these locations, the standard would be exceeded by only de minimis amounts. UDC Report at 29–30.

Mitigation measures designed to handle the projected 1991 traffic volume within the project area were incorporated into the project plan and approved by UDC. They included (1) a traffic lay-by lane to provide standing and drop-off space for buses and taxis that now block traffic, (2) relocation of a taxi stand, (3) revised and more effectively enforced "no standing" regulations, (4) revised signal timing, and (5) additional traffic enforcement agents. UDC Report at 23.

At the conclusion of its report, under "Findings Pursuant to the State Environmental Quality Review Act", UDC concluded:

Based on the foregoing and having fully considered the FEIS and considered, determined and found the matters set forth above, UDC hereby (*a*) finds that all requirements of SEQRA and Part 617 have been met in preparation and consideration of the FEIS and (*b*) makes the following additional findings:

(1) consistent with the social, economic and other essential considerations, from among the reasonable alternatives there-

to, the action to be approved is one which minimizes or avoids adverse environmental effects to the maximum extent practicable, including the effects disclosed in the Final Environmental Impact Statement; and

(2) consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided by incorporating as conditions to the decision those mitigating measures which were identified as practicable.

UDC Report at 43–44. These findings, which UDC made pursuant to SEQRA's requirements, were based on the findings regarding air quality that it had made by using CAA's 9 ppm standard to measure the impact of the project on air quality and to evaluate the effectiveness of proposed mitigation measures.

On November 9, 1984, after holding public hearings, the New York City Board of Estimate expressly adopted UDC's findings and approved the project.

## C. *The CAA Suit: Plaintiffs' Proposed Amended Complaint.*

One day before plaintiffs commenced this action, the New York Appellate Division affirmed the dismissal of plaintiffs' SEQRA challenges to UDC's analysis of traffic and air quality impacts and their claims of procedural defects in the EIS process. *Jackson*, 110 A.D.2d 304, 494 N.Y.S.2d 700. The Court of Appeals affirmed, 67 N.Y.2d 427, 503 N.Y.S.2d 298, 494 N.E.2d 429. In this case, plaintiffs' original complaint contained four claims for relief premised essentially on the argument that the project would prevent attainment of the NAAQS. After he dismissed the original complaint for failure to state a claim, Judge Griesa granted leave to submit a proposed amended complaint but cautioned plaintiffs that they must allege specific violations of an SIP or some other statutory provision in order to state a claim cognizable under the citizen suits provisions. He also noted that plaintiffs must

show why they are entitled to the injunctive relief they are seeking and warned that even if a provision of the SIP is violated, "it does not follow that the project gets enjoined". Transcript of June 26, 1986 argument at 10, *Wilder v. Thomas,* 659 F.Supp. 1500 (S.D.N.Y.1987) (Griesa, *J.*).

The plaintiffs' proposed amended complaint set forth six claims for relief, all based on defendants' alleged failures to comply with the 1984 SIP.

1. The first claim, "Failure to eliminate carbon monoxide 'hot spots' caused by the Project by 1987", alleges that it is a "condition or requirement" of the 1984 SIP, § 3.5.3, that all carbon monoxide hot spots be eliminated by December 31, 1987, and that construction of the project will "assure the continued existence" of hot spots in the project area after the deadline. The various defendants are alleged to be liable for this anticipated SIP violation because they, or their appointees, have allowed the project to go forward despite the predicted continued existence of hot spots.

2. The second claim, "Failure to require Project air pollution mitigation measures to be effective", is based on § 3.6(A) of the 1984 SIP, which provides:

> To further insure that the carbon monoxide standard is attained in New York City, if an EIS for a project proposal identifies a violation or exacerbation of the carbon monoxide standard, then the City commits to assure that mitigating measures will be implemented by the project sponsor or City, so as to provide for attainment of the standard by December 31, 1987 and maintenance of it thereafter.

1984 SIP at 3–24. The complaint alleges that defendants failed to commit to, or to seek the City's commitment to, mitigation measures for the project that would be effective to "prevent violation of, and assure maintenance of" the NAAQS after December 31, 1987.

3. The third claim, "Failure to compute carbon monoxide emission reductions in prior years for Midtown Manhattan", refers to the 1984 SIP § 1.6, which requires that DEC

will compute, for each pollutant, emission reductions achieved during the calendar year through implementation of control measures on permitted sources, area source, and mobile sources. Actual reductions thus calculated will be compared with those predicted in the SIP. Shortfalls, if any, will be discussed as to their effect on RFP [reasonable future progress] in future years.

\* \* \* \* \* \*

A summary of emission reductions resulting from control measures and other influencing factors will be prepared and a graphical comparison made between the growth and control line and the RFP line included in the SIP.

*Id.* at 1–10. The complaint alleges that DEC delegated this reporting duty to DEP but that neither DEC nor DEP had computed or reported carbon monoxide emissions for midtown Manhattan for 1985.

4. The fourth claim, "Failure to address Project interaction with other changes in West Midtown", refers to § 3.6 of the 1984 SIP, which requires that the annual report "give special attention to significant changes in the West Midtown area and to any mitigating measures that might be necessary in that area." *Id.* at 3–25. Section 3.6 also requires that the EIS for new projects be used to provide the underlying information for the annual report. *Id.* at 3–23–3–24. The complaint alleges that the defendants breached these duties under the SIP by (1) not requiring the production of materials in the EIS that were necessary in order to give special attention to the midtown area in the annual report; (2) not giving special attention to significant changes in the midtown area (*i.e.,* the interaction between the project, the Javits Center, and the changing traffic flow patterns generated by the center); and (3) failing to describe these significant changes "realistically" in the annual report.

5. The fifth claim, "Effectiveness of carbon monoxide mitigation measures for Project not determinable", refers again to § 3.6 of the 1984 SIP and alleges that the responsible agencies have failed to provide

computations and reports on emissions reductions that are required by the SIP and necessary for the evaluation of the effectiveness of project mitigation measures.

6. The sixth claim, "SIP evaluation of Project effect or emissions did not occur before Project approval", refers to that part of § 3.6 of the 1984 SIP that designates the EIS as "[t]he primary mechanism for comprehensive evaluation of major projects which may have a significant impact on air quality". *Id.* at 3–23. Like the second claim, this claim relies as well on the statement in § 3.6 that the city "commits to assure" that adequate mitigation measures will be implemented to assure attainment and maintenance of the NAAQS. *Id.* at 3–24. In essence this claim alleges that DEC and DEP violated the SIP by not reviewing the project EIS prior to project approval by the UDC.

Plaintiffs seek (1) a declaration that the planning for and approval of the project has resulted in SIP violations; (2) an injunction against construction of the project; (3) a direction that defendants DEC, DEP, Schultz, and Williams carry out their duties to enforce the SIP; and (4) costs and attorneys' fees.

Prior to denying plaintiffs leave to file their proposed amended complaint, Judge Griesa reviewed the complaint at length and concluded that "there is no indication that the deficiencies in plaintiffs' claims can be cured by further amendment." He found further that plaintiffs were barred from relitigating the adequacy of UDC's analysis of the project's impact on traffic and air quality, and the adequacy of the mitigation measures approved by UDC. Thus, Judge Griesa ultimately found the proposed amended complaint legally insufficient and denied plaintiffs any opportunity to further amend their pleading. On this appeal we view his decision as if the amended complaint had been filed and then subject to review under Fed.R.Civ.P. 12(b)(6).

For the following reasons, we affirm the order of the district court.

## II.  DISCUSSION

In the discussion to follow we will, first, examine the scope of the citizen suits provision to determine whether the plaintiffs' first claim falls within that scope. Next, we will address the collateral estoppel effect on plaintiffs' second, fourth, and fifth claims of the state court judgment in *Jackson*, 110 A.D.2d 304, 494 N.Y.S.2d 700. Finally, we will address the sufficiency of the third claim, which is based on reporting requirements, and of the sixth claim for relief.

### A.  *Scope of the Citizen Suits Provison/The First Claim for Relief.*

Citizen suits are an important aspect of the CAA enforcement scheme. *See Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir.1976); *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 699–700 (D.C.Cir.1974). In enacting this provision, congress expanded federal court jurisdiction by circumventing the diversity of citizenship, jurisdictional amount, and traditional standing requirements, *see* 535 F.2d at 172–73; 510 F.2d at 700; S.Rep. No. 91–1196, 91st Cong., 2d Sess., *reprinted at* Appendix B, 510 F.2d at 725, in order to allow citizens to bring suit against the administrator of EPA for failure to perform nondiscretionary duties, or against polluters, including government agencies and the United States, for violation of specific requirements of an SIP. *See* 510 F.2d at 700; S.Rep. No. 91–1196, *reprinted at* 510 F.2d at 725.

Congress intended citizen suits to "motivate governmental agencies charged with the responsibility to bring enforcement and abatement proceedings" against violators. S.Rep. No. 91–1196, *reprinted at* 510 F.2d at 723. *See* 510 F.2d at 700. In order to avoid either overburdening the courts or unduly interfering with implementation of the act, however, congress carefully circumscribed the scope of the provision by authorizing citizens to bring suit only for violations of specific provisions of the act or specific provisions of an applicable implementation plan. *See* S.Rep. No. 91–1196, *reprinted at* 510 F.2d at 723, *see also*

*Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 63 (2d Cir.1985) (discussing congressional purpose in limiting citizen suits). By the specificity requirements congress sought to establish "an objective evidentiary standard [that] would have to be met by the citizen who brings an action under [§ 7604]", and thereby eliminate the need for "reanalysis of technological or other considerations at the enforcement stage." *See Citizens Ass'n of Georgetown the Committee of 100 on the Fed. City v. Washington,* 535 F.2d 1318, 1322 (D.C.Cir.1976) (citation omitted).

■ Thus, plaintiffs are limited under § 7604 to seeking relief from specific violations of existing SIPs; they may not, through a citizen suit, obtain modification of an SIP to conform with their own "notion of proper environmental policy." *Action for Rational Transit v. West Side Highway Project,* 699 F.2d 614, 616 (2d Cir.1983). Such a claim must be addressed directly to the court of appeals, which has exclusive jurisdiction to review EPA approval of SIPs. *See id.;* 42 U.S.C. § 7607(b)(1).

Section 7604(a)(1)(A) allows any person to bring a suit against an individual or government agency who violates an "emission standard or limitation" under the CAA. The statutory definition of "emission standard or limitation" includes "any condition or requirement under an applicable implementation plan relating to transportation control measures". 42 U.S.C. § 7604(f)(3).

■ Plaintiffs contend that their first claim alleges a specific violation of an existing SIP because the elimination of carbon monoxide hot spots by 1987 is a condition or requirement relating to a transportation control measure. We disagree.

In prior cases we have recognized the limitations that congress has placed on the exercise of jurisdiction over citizen suits under § 7604. *See Council of Commuter Orgs. v. Metro. Transp. Authority,* 683 F.2d 663, 670 (2d Cir.1982) (plaintiffs seeking to bring a citizen suit "for violation of an emission standard or limitation contained in an applicable plan * * * must

allege a violation of a specific strategy or commitment in the SIP and describe, with some particularity, the respects in which compliance with the provision is deficient") (footnote omitted); *Action for Rational Transit v. West Side Highway,* 699 F.2d at 616 ("[t]he aims and goals of the SIP are not enforceable apart from the specific measures designed to achieve them").

In *Council of Commuter Orgs. v. Metro. Transp. Authority,* we suggested that claims relating to a mass transit improvement provision in New York's SIP and including an allegation that New York City violated a fare stabilization strategy by increasing transit fares were "arguably sufficient to state a claim" under the citizen suits provision. 683 F.2d at 671. We stated, however, that "vague and conclusory assertions [such as] 'Failure to make reasonable further progress in the 1979 SIP implementation' [and] 'Failure to rehabilitate/improve reliability, safety, etc., of region's transit system' followed by citation to large chunks of New York's SIP as the allegedly violated provision" were insufficient to sustain a citizen suit. *Id.* at 670. Plaintiffs' first claim, which alleges, in essence, that the city has failed, or will fail, to attain the NAAQS in the project area thus falls short of this requirement of specificity.

Plaintiffs' construction of the CAA would eliminate the distinction between the NAAQS and measures that are designed to assure attainment of the NAAQS. The CAA and the regulations promulgated thereunder, however, emphasize the distinction between the attainment of the NAAQS, which is a goal of the CAA, and the specific provisions of an SIP which are the only permissible subjects of a citizen suit. As we have noted, plaintiffs contend that their first claim alleges a violation of a condition or requirement relating to a transportation control measure. The EPA has defined a transportation control measure, however, as "any measure that is directed toward reducing emissions of air pollutants from transportation sources". 40 C.F.R. § 51.100(r) (1987). *See Council of Commuter Orgs. v. Metro. Transp. Au-*

*thority,* 683 F.2d at 666 n. 2 (" 'transportation control measures' are strategies designed to reduce pollution by limiting or controlling motor vehicle use"). *See also* 42 U.S.C. § 7604(f)(3) (including "any condition or requirement under an applicable implementation plan relating to transportation control measures" within the meaning of "emission standard or limitation"). The statutory and regulatory language indicates that a "transportation control measure" is designed to help achieve the goal of reducing pollution, and to assure attainment of the NAAQS.

The NAAQS for carbon monoxide, by contrast, is the standard established by the EPA pursuant to congressional directive, *see* 42 U.S.C. § 7409(a); 40 C.F.R. § 50.8 (1987), that the EPA determined the states must attain in order to effectuate congress's goal: "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population". § 7401(b)(1). *See Concerned Citizens of Bridesburg,* 836 F.2d at 780. Section 7604 does not provide for citizen suits based on violation of, or failure to attain, the NAAQS itself.

Our conclusion that the NAAQS is not itself a specific provision of an SIP, which is the only permissible subject of a citizen suit, is further supported by the text of § 7410(a)(2)(B), which requires that the administrator approve a proposed SIP if

> it includes emission limitations, schedules, and timetables for compliance with such limitations, and such other measures *as may be necessary to insure attainment and maintenance of such primary or secondary standard,* including, but not limited to, transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D) (emphasis added).

Thus, the enumerated categories of SIP requirements are designed to "insure attainment" of the NAAQS; the NAAQS is not, itself, within the categories of SIP requirements and it is not transformed from a standard into a requirement merely because the SIP states "that all hot spots will be eliminated by the end of 1987." 1984 SIP at 3–21. This statement is simply, as the district court found, a restatement of the CAA's requirement that the NAAQS for carbon monoxide be attained by Dec. 31, 1987. *See* 42 U.S.C. § 7502(c) (date for attainment of NAAQS).

Plaintiffs also argue that because the SIP contains a commitment to "[t]he ongoing process of identifying and analyzing carbon monoxide hot spots and * * * to the implementation of measures specific to each hot spot as is found necessary", 1984 SIP at 1–5, there will be a violation of a condition or requirement of the SIP relating to a transportation control measure because hot spots will allegedly persist in the project area after 1987, during construction and after completion of the project, in spite of the mitigation measures approved by the UDC. Putting aside for the moment the questions of whether the plaintiffs are estopped from litigating the sufficiency of the mitigation measures (see part II, *infra*), and of whether the plaintiffs could obtain an injunction against the project even if they could show that hot spots will persist in the project area after 1987 (an issue we need not reach), we think that plaintiffs' construction of the statute would contravene congressional intent and render superfluous the clear statutory distinctions between the NAAQS and the types of specific strategies congress meant to be enforceable through citizen suits.

▬ Plaintiffs argue that the district court's interpretation of the citizen suits provision would render meaningless the words "relating to" in § 7604(f)(3). Not so. There are circumstances where the term "condition or requirement relating to a transportation control measure" would retain significance. For example, the city has committed to the process of identifying and analyzing hot spots and to implementing measures specific to each hot spot in order to attain the NAAQS. A commitment to changing traffic flow patterns at a particular hot spot is a commitment to a "transportation control measure". A condition or requirement *relating to* that

transportation control measure is the installation of a new traffic signal system. *See* 1984 SIP at 3–16 (Area Wide Control Measures). Under this view a suit could be brought by a citizen if the state (a) failed to obtain the list of candidate hot spots from local transportation planning agencies as required by 1984 SIP 3.2 (Selection of Candidate Hot Spots); or (b) failed to implement the specific requirement relating to a transportation control measure designed to eliminate the hot spot, *i.e.*, installation of a new traffic signal system.

Contrary to plaintiffs' contention, our interpretation does not trivialize or emasculate the citizen suits provision; rather, it adheres to the statutory language while effectuating both the congressional purpose of fostering enforcement and the equally important purpose of providing specific, objective standards for citizen suits.

#### B. *Collateral Estoppel.*

■ Several of plaintiffs' additional claims challenge the adequacy of the mitigation measures the UDC approved as sufficient to lower carbon monoxide levels in the project area. Before we take up these claims in detail, we must consider whether collateral estoppel precludes plaintiffs' relitigation of the adequacy of the mitigation measures approved by UDC. If it does, the second, fourth, and fifth claims, which rely on alleged deficiencies in the EIS process, must fail.

#### 1. *Overview of collateral estoppel.*

Collateral estoppel, or issue preclusion, is the branch of *res judicata* doctrine that prevents a party from relitigating an issue of fact or law that has been decided in an earlier suit. *See Murphy v. Gallagher*, 761 F.2d 878, 879 (2d Cir.1985). Federal courts are required by 28 U.S.C. § 1738 to give effect to the collateral estoppel rules of the state that rendered a prior judgment where the same issues are raised later in a federal proceeding. *See Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883,

1889, 72 L.Ed.2d 262 (1982); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)); *Cameron v. Fogarty*, 806 F.2d 380, 384 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987). Thus, our determination of the preclusive effect of the prior New York judgment in this case requires an analysis of the collateral estoppel effect that would be accorded the prior judgment under New York's standards for collateral estoppel. *See Migra*, 465 U.S. at 81, 104 S.Ct. at 896 (in the absence of federal law modifying § 1738, the preclusive effect of the state judgment is determined by that state's law); *Kremer*, 456 U.S. at 481–82, 102 S.Ct. at 1898 (§ 1738 "commands a federal court to accept the rules chosen by the State from which the judgment is taken").

If the elements of collateral estoppel under New York law are otherwise satisfied, the New York courts' affirmance of the results of the UDC administrative process are entitled to preclusive effect. *See Kremer*, 456 U.S. at 480, 485, 102 S.Ct. at 1896, 1899; *Mitchell v. Nat'l Broadcasting Co.*, 553 F.2d 265, 276 (2d Cir.1977); *Capital Tel. Co. v. Pattersonville Tel. Co.*, 56 N.Y.2d 11, 17, 451 N.Y.S.2d 11, 13, 436 N.E.2d 461, 462 (1982). In *Kremer*, the Supreme Court gave preclusive effect to a New York court judgment affirming an agency (New York State Division of Human Rights) determination that there was no probable cause to believe that an employer had engaged in discriminatory practices. 456 U.S. at 463–64, 485, 102 S.Ct. at 1888, 1899. The Court emphasized that in order to qualify for full faith and credit under § 1738, state proceedings need only satisfy the requirements of due process and be sufficient to be entitled to preclusive effect in the courts of that state. *Id.* at 481, 102 S.Ct. at 1897–98.

Relying on *Zanghi v. Inc. Village of Old Brookville*, 752 F.2d 42 (2d Cir.1985), plaintiffs argue that collateral estoppel cannot apply in this case because UDC's findings were made in a legislative, rather than adjudicatory, capacity. *See id.* at 46 (collateral estoppel applies " 'to the quasi-judi-

cial determinations of administrative agencies when rendered pursuant to adjudicatory authority' ") (citing *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 496, 478 N.Y.S.2d 823, 825–26, 467 N.E.2d 487, 489–90 (1984)). But *Zanghi* and *Ryan* involved the application of collateral estoppel directly to administrative proceedings, and this case, like *Kremer*, involves the collateral estoppel effect to be given after judicial review of an administrative determination. *See Kremer*, 456 U.S. at 481 n. 21, 102 S.Ct. at 1897 n. 21 ("It is well established that judicial affirmance of an administrative determination is entitled to preclusive effect. There is no requirement that judicial review must proceed *de novo* if it is to be preclusive.") (citations omitted).

New York's requirements for collateral estoppel were articulated in a leading case, *Schwartz v. Pub. Adm'r of Bronx*, 24 N.Y. 2d 65, 71, 298 N.Y.S.2d 955, 960, 246 N.E. 2d 725, 729 (1969), as follows:

> New York Law has now reached the point where there are but two necessary requirements for invocation of the doctrine of collateral estoppel. There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.

*See Ryan*, 62 N.Y.2d at 500–02, 478 N.Y.S. 2d at 826–27, 467 N.E.2d at 490–91; *Capital Tel.*, 56 N.Y.2d at 13, 451 N.Y.S.2d at 13, 436 N.E.2d at 463, *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 51, 423 N.E.2d 807, 809 (1981); *Gramatan Home Investors Corp. v. Lopez*, 46 N.Y.2d 481, 484, 414 N.Y.S.2d 308, 310–11, 386 N.E.2d 1328, 1330–31 (1979).

Thus, we must determine whether the issue of the adequacy of the mitigation measures approved by UDC was an issue that was determined and necessary to the judgment in the New York court, and whether the parties who would be precluded from relitigating that issue in federal court had a full and fair opportunity to litigate the issue in state court.

*2. Identity of issues.*

In New York "collateral estoppel is a flexible doctrine which can never be rigidly or mechanically applied". *Gilberg*, 53 N.Y. 2d at 292, 441 N.Y.S.2d at 51, 423 N.E.2d at 809 (citations omitted). Nevertheless, the requirement of identity of issues, unlike the requirement of identity of parties, is an absolute requirement. *See Gramatan*, 46 N.Y.2d at 486, 414 N.Y.S.2d at 311, 386 N.E.2d at 1331. Because this case arises in the context of the "labyrinth that is the Clean Air Act," *Connecticut v. Envtl. Protection Agency*, 696 F.2d 147, 150–51 (2d Cir.1982); *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 865, 104 S.Ct. 2778, 2793, 81 L.Ed. 2d 694 (1984), determining whether the issues are identical is not easy. Nevertheless, a careful examination of the facts in the context of the joint state and federal responsibilities established by the act, *see Concerned Citizens of Bridesburg*, 836 F.2d at 780; *Conn. v. EPA*, 696 F.2d at 151, leads us to conclude that the issues in this case and the state court litigation are, indeed, identical.

In the New York appellate division, plaintiffs appealed from that portion of the judgment of the supreme court, New York County, that dismissed their challenges to UDC's analysis of the project's impact on traffic and air quality and their claims that UDC's environmental review of the project's impact was procedurally deficient. *Jackson*, 110 A.D.2d 304, 305, 494 N.Y.S.2d 700, 701 (1st Dep't 1985). The appellate division reviewed both the procedural and the substantive aspects of UDC's environmental analysis in order to determine whether UDC had complied with SEQRA's requirements. *Id.* at 308, 494 N.Y.S.2d at 703.

The appellate division agreed with the trial court's rejection of plaintiffs' claims concerning UDC's traffic and air quality analysis. *Id.* at 310, 494 N.Y.S.2d at 704. The court found that UDC had provided sufficient opportunity for public participation in the project's air pollution analysis, and rejected plaintiffs' claims that there were omissions and errors in the

analysis of traffic and air quality impacts. *Id.*, 494 N.Y.S.2d at 704. The court found as well that UDC had employed "the most appropriate computer model" to calculate automobile emissions, and that its calculations were reliable. *Id.*, 494 N.Y.S.2d at 704.

The appellate division addressed next the issue of the adequacy of the mitigation measures approved by UDC, one of the exact issues plaintiffs seek to relitigate here, and concluded:

> With regard to the obligation to mitigate the Project's adverse effects on traffic and air quality, UDC compiled detailed information and proposed extensive mitigative measures to minimize those adverse impacts and to meet the Federal Clean Air Act's standard for acceptable carbon monoxide levels. As part of its hard look at this problem UDC analyzed the traffic impact for both the Project's area and a large surrounding area. It adopted a "worst case" analysis, which included assuming peak hour traffic, simultaneous full use of all theatres, no diversion of traffic to less congested streets, and no increased enforcement of traffic regulations, to arrive at a very conservative model for traffic analysis. This same analysis was the basis for the air quality assessment.
>
> To meet the expected adverse impacts UDC studied and then proposed a multitude of mitigative measures which would place the area within federal and City guidelines on carbon monoxide levels and which in fact are expected to produce lower carbon monoxide concentrations than presently exist. Our review of UDC's analysis of the traffic and air quality impacts assures us that UDC identified the adverse traffic and air quality impacts, took a hard analytical look at them and proposed mitigative measures which, it had a reasonable basis to conclude, would in fact minimize those adverse effects. Special Term, therefore, correctly deferred to the judgment of UDC in this area.

*Id.* at 310–11, 494 N.Y.S.2d at 704. Thus, the appellate division held (1) that UDC had complied with the procedural requirements of SEQRA for the EIS process and (2) that UDC's approval of the mitigation measures that it had concluded were sufficient to minimize the project's adverse effects on traffic and air quality and sufficient to meet the NAAQS for carbon monoxide, was neither arbitrary nor capricious, nor unsupported by substantial evidence. *See id.* at 309, 494 N.Y.S.2d at 702, 704. In short, the state courts rejected plaintiffs' challenge to the adequacy of the mitigation measures.

The same adequacy issue that was decided by the state court is being raised by plaintiffs now in federal court. Plaintiffs argue, however, that the state SEQRA standards and the federal CAA standards are sufficiently distinct to preclude a finding of identity of issues here. *See Cullen v. Margiotta,* 811 F.2d 698, 732 (2d Cir.) ("issues are not identical when the standards governing them are significantly different") (citations omitted), *cert. denied,* — U.S. ——, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). In *Cullen* we held that a state court ruling that plaintiffs could not maintain a class action would not be given collateral estoppel effect because the state statute, N.Y.Civ.Prac. L. & R. § 1005, does not permit class actions for separate wrongs to separate persons, but Fed.R. Civ.P. 23 does.

*Cullen* does not, however, control the disposition of the collateral estoppel issue in this case. First, substantive standards under SEQRA and the CAA are not diametrically opposed as the class action rules were in *Cullen;* rather, the SEQRA EIS process is the mechanism that the state uses to evaluate indirect sources in order to insure attainment of the NAAQS. Furthermore, although the SEQRA standard (agency shall "choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects") does not, on its face, embody the absolute requirement that the NAAQS be attained by a specific date, the UDC, during the EIS process and in its report, and the parties, in their pleadings and arguments before the state and

federal courts, all looked to the NAAQS as "the standard" that must be attained.

Second, the standards for review of agency determinations in New York State and in federal courts are essentially the same. *Compare* N.Y.Civ.Prac. L. & R. § 7803 *with* 5 U.S.C. § 706. *See Jackson,* 110 A.D.2d at 307–08, 494 N.Y.S.2d at 703 (court determines "whether the agency has complied with the applicable law, identified the relevant areas of environmental concern, taken a 'hard look' at them and made a reasoned elaboration of the basis for its determinations") (citations omitted); *Aldrich v. Pattison,* 107 A.D.2d 258, 265, 486 N.Y.S.2d 23, 29 (2d Dep't 1985) (state court applies federally derived standard to EIS review); *H.O.M.E.S. v. New York State Urban Dev. Corp.,* 69 A.D.2d 222, 231, 418 N.Y.S.2d 827, 832 (4th Dep't 1979) (state standard of administrative review derived from federal NEPA cases). Nevertheless, while the plaintiffs concede that the New York judgment controls on the issue of whether UDC's findings with regard to mitigation measures were "reasonable", they suggest that the judgment is somehow not controlling in this case because the New York court did not decide that UDC's findings were "true, or even * * * supported by a preponderance of the evidence." Appellants' brief at 32–33. Because plaintiffs would not have been entitled to such a determination in federal court either, this argument is totally unsupportable. "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences", *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976), and to "make a 'reasoned elaboration' of the basis for its determination". *H.O.M.E.S.,* 69 A.D.2d at 231, 418 N.Y.S.2d at 832 (citing *City of Rochester v. U.S. Postal Service,* 541 F.2d 967, 973 (2d Cir. 1976)).

Even if the issue were properly before this court, or if it had come to us in the first place, our review of the sufficiency of the project's mitigation measures would have been the same as the state court's because SEQRA's EIS process was designated in the SIP as the primary mechanism for indirect source review. Plaintiffs argue that the inquiry in federal court would be different because the NAAQS is an absolute, objective requirement that they suggest would be somehow more difficult to satisfy than the SEQRA standard. The record indicates, however, that throughout its evaluation and report on the project UDC utilized the federal nine ppm standard for carbon monoxide incorporated in the NAAQS. Thus, even if UDC could have applied a less stringent standard to satisfy SEQRA's requirements, it did not in fact do so.

Furthermore, the appellate division found that UDC had a reasonable basis to conclude that the mitigation measures would enable the project to meet the federal CAA standards, *see* 110 A.D.2d at 311, 494 N.Y.S.2d at 704, and this conclusion was approved by the New York Court of Appeals, 67 N.Y.2d 400, 426, 503 N.Y.S.2d 298, 311, 494 N.E.2d 429, 441 (1986).

The pleadings in the two cases provide further support for our finding of identity of issue. *See Watts v. Swiss Bank Corp.,* 27 N.Y.2d 270, 278, 317 N.Y.S.2d 315, 321, 265 N.E.2d 739, 744 (1970) (finding of identity supported by comparison of pleadings); *see also Mother's Restaurant, Inc. v. Mama's Pizza,* 723 F.2d 1566, 1570 (Fed. Cir.1983) (court looked to parties' pleadings to ascertain whether an issue was actually litigated); *Nelson v. Swing–A–Way Mfg. Co.,* 266 F.2d 184, 187 (8th Cir.1959) (" 'look to the pleadings * * * and examine the record to determine the questions essential to the decision of the former controversy' ") (quoting *United Shoe Machinery Corp. v. United States,* 258 U.S. 451, 459, 42 S.Ct. 363, 366, 66 L.Ed. 708 (1922)). Plaintiffs themselves raised the issue of the adequacy of the mitigation measures under CAA standards in their Article 78 petition. Verified petition ¶¶ 21, 22, 25, *Rosenthal v. New York State Urban Dev. Corp.,* No. 3020/85 (Sup.Ct.N.Y.Cty. June 15, 1985). The language in the second claim for relief in plaintiffs' proposed amended federal complaint ("Failure to require Project air pollution mitigation measures to be effective") duplicates, to a

great extent, the language in the first claim for relief in the state Article 78 proceeding ("The FEIS fails to address adequately the air pollution effects of the Project"). Both claims allege, essentially, that UDC failed to obtain the city's commitment to mitigation measures sufficient to meet the NAAQS.

### 3. *Issue necessary to state court's judgment.*

As we previously noted, under New York's collateral estoppel principles, even if the identical issue was decided in the state court, that decision must also have been necessary to the court's judgment. *See Kleinberger v. Town of Sharon*, 116 A.D. 2d 367, 369, 501 N.Y.S.2d 746, 747 (3d Dep't 1986) (" 'a judgment does not work an estoppel as to unessential facts, even though put in issue by the pleadings and directly decided' ") (citing *Silberstein v. Silberstein*, 218 N.Y. 525, 113 N.E. 495 (1916)). In this case, the federal and state statutory schemes are highly interrelated and both the parties and the courts relied on the federal standard in assessing UDC's compliance with SEQRA. In short, the adequacy of the mitigation measures under the CAA was, as a practical matter, a necessary component in the state court's decision. *Cf. Dennis v. Rhode Island Hospital Trust Nat'l Bank*, 744 F.2d 893, 899 (1st Cir.1984) ("An issue may be 'actually' decided even if it is not *explicitly* decided, for it may have constituted, logically or practically, a necessary component of the decision reached.") (emphasis in original). This is not a case where the state court made "an incidental or collateral determination of an issue that was not material" that should not be accorded preclusive effect in a later litigation. *See* IB J. Moore, *Moore's Fed. Prac.* ¶ 0.443 [5.–1].

### 4. *Full and fair opportunity to litigate the issue.*

We conclude as well that the plaintiffs had a full and fair opportunity to litigate this issue in the state court. The factors that a New York court would consider in determining whether plaintiffs had a full and fair opportunity include "the size of the claim, the forum of the prior litigation, * * * the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation." *Schwartz*, 24 N.Y.2d at 72, 298 N.Y.S.2d at 961, 246 N.E.2d at 729.

■ Here, plaintiffs do not seek money, but the underlying controversy in the state case—viability of the project—was the same as the one now before this court. The state claims were litigated through two levels of appeal by the same highly qualified counsel as appears before this court. There is no new evidence germane to the issue, and no suggestion of a compromise verdict. Moreover, the differences in applicable law are a matter of form rather than substance, and plaintiffs were not only in the best position to foresee the possibility of future litigation, they were actually prepared with the complaint in this case and filed it immediately after they lost the state action. Simply because application of collateral estoppel in this federal action to an issue decided in state court might deprive plaintiffs of the opportunity to litigate here a claim that is based, in part, on federal law does not, of itself, render the doctrine inapplicable. *See Murphy v. Gallagher*, 761 F.2d 878, 885–86 (2d Cir.1985) (even when federal court action raises claims within exclusive federal jurisdiction, collateral estoppel may apply to component issues).

### 5. *Identity of parties.*

■ Finally, although two of the plaintiffs here, Brendan Gill and the Whitby Tenants' Association, were not parties in the state courts, there is sufficient privity between the two new plaintiffs and the state court petitioners, who are all plaintiffs in this case, to establish identity of parties. *See Green v. Santa Fe Industries, Inc.*, 70 N.Y.2d 244, 253, 519 N.Y.S. 2d 793, 796, 514 N.E.2d 105, 107–08 (1987) ("to establish privity the connection between the parties must be such that the interests of the nonparty can be said to

have been represented in the prior proceeding"); *Gramatan v. Home Investors Corp.*, 46 N.Y.2d at 486, 414 N.Y.S.2d at 311, 386 N.E.2d at 1331 (identity of parties is not an absolute requirement).

In both the state court petition and the proposed amended federal complaint, the named plaintiffs characterize themselves as individuals who work or live in the project area and who will be injured in their enjoyment of the project area if the project is built. *See Rosenthal v. New York State Urban Dev. Corp.*, verified petition at ¶ 10, No. 3020/85 (Sup.Ct.N.Y.Cty. June 15, 1985) (petitioners "will be injured in their enjoyment of the area if the Project is allowed to proceed without a proper review of its environmental impacts"); *Wilder v. Thomas*, 659 F.Supp. 1500 amended complaint at ¶ 8, 85 Civ. 8356 (S.D.N.Y. July 16, 1986) (plaintiffs "will be injured in their health and their enjoyment of the Project area if the Project is built and results in violations of the SIP").

Significantly, the issues raised in the two proceedings are such that they do not vary according to individual plaintiffs. *See Katz v. Blum*, 460 F.Supp. 1222, 1224 (S.D. N.Y.1978) (dicta), *aff'd without opinion*, 603 F.2d 213 (2d Cir.1979); *see also Amalgamated Sugar Co. v. NL Industries*, 825 F.2d 634, 640–41 (2d Cir.) (where nonparties' interests were adequately represented in earlier litigation, they may be bound), *cert. denied*, —— U.S. ——, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987).

■ In addition, it is appropriate to allow the state and city defendants to invoke defensive collateral estoppel even though they were not parties to the state court proceeding. Mutuality of estoppel is no longer an essential part of collateral estoppel doctrine. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326–27, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Labs, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971); *LaRocca v. Gold*, 662 F.2d 144, 149 (2d Cir.1981); *Schwartz*, 24 N.Y.2d at 70, 298 N.Y.S.2d at 959, 246 N.E.2d at 728. There is no reason in this case to permit plaintiffs to relitigate an issue that was decided adversely to them in state court merely because they have joined additional defendants this time around. *See Township of Hopewell v. Volpe*, 446 F.2d 167, 171 (3rd Cir.1971). The central question is whether the plaintiffs have had their day in court, *see id.*, and the answer here is "yes".

### 6. *Conclusion on collateral estoppel.*

The state court judgment establishes the sufficiency of the EIS process and the adequacy of the mitigation measures; plaintiffs are collaterally estopped from contesting those determinations. Consequently, plaintiff's second claim for relief must fail in its entirety. The fourth and fifth claims, which rely on alleged deficiencies in the EIS process, are also precluded on collateral estoppel grounds.

### C. *Reporting Requirements.*

Although the third claim alleges a failure of DEC and DEP to report carbon monoxide emission reductions from midtown Manhattan for 1984 and 1985, plaintiffs have conceded that the reports have, in fact, been filed, but complain that the reports are deficient because they do not contain the types of graphical depictions contained in the 1979 SIP and do not compute emission reductions separately for each separate control measure.

Even if we found that a specific reporting requirement contained in an SIP could be a condition or requirement relating to a transportation control measure, and therefore the subject of a citizen suit, this claim would fail because the 1984 SIP does not require separate calculations for individual control measures.

### D. *Sixth Claim.*

Finally, plaintiffs' sixth claim, which alleges in essence that the DEC and DEP should have reviewed the project EIS prior to project approval by the UDC, must also fail. First, the SIP does not contain a requirement that DEC or DEP make an "SIP review" of a project before the lead agency, in this case UDC, approves it. DEC will review the environmental effects

of the project if and when a permit application is submitted for the project as required by N.Y.Comp.Codes Rules. & Regs. tit. 6, § 203.5 (1986). To the extent that the sixth claim relies as well on the adequacy of the mitigation measures approved by UDC and adopted by the Board of Estimate when it approved the project, it is precluded on the collateral estoppel ground previously discussed.

The order of the district court is affirmed.