OPINION OF THE COURT
 

 Meyer, J.
 

 The provisions of the Uniform Land Use Review Procedure (ULURP; New York City Charter § 197-c) respecting the use, development or improvement of real property subject to city regulation are not applicable to a redevelopment project carried out under the New York State Urban Development Corporation Act (Act; L 1968, ch 174, as amended; McKinney’s Uncons Laws of NY § 6251 if). Special Term, therefore, properly dismissed the article 78 petitions in two proceedings brought to invalidate the November 9, 1984 resolution of the Board of Estimate approving the Times Square Redevelopment Project and authorizing the Mayor to enter into agreements in relation thereto with the Urban Development Corporation (UDC) and designated developers, and to stay the making of or performance under such agreements until ULURP has been complied with. The order of the Appellate Division affirming Special Term’s judgments of dismissal should, therefore, be affirmed, with costs.
 

 I
 

 A description of the Times Square Redevelopment Project, its history and the procedures in relation to it under the State Environmental Quality Review Act and the Eminent Domain Procedure Law is set forth in
 
 Matter of Jackson v New York State Urban Dev. Corp.
 
 (67 NY2d 400 [decided herewith]) and need not be here repeated. The proceedings involved in this appeal are predicated on the concept that ULURP remains applicable and that the city cannot validly contract with respect to the project without first complying with ULURP.
 

 The first proceeding, brought within a week after adoption of the Board of Estimate resolution, was instituted by Waybro Corporation, which owns a building at 210 West 43rd Street within the project area and, therefore, subject to condemnation. The second was instituted by Rosenthal & Rosenthal, Inc., the occupant, and Broadway 41st Street Realty Corporation, the owner of a building at 1451 Broadway, likewise
 
 *353
 
 within the project area and subject to condemnation. The proceedings have been consolidated on consent. Both petitioners contend that the project is within the types of land use activity to which ULURP applies and that, therefore, the development plan and Board resolution should have been submitted to Community Board No. 5, whose district includes the project area. The Board of Estimate and other city officials named as respondents, the UDC and its subsidiary Times Square Redevelopment Corporation denied that the project is within ULURP, set forth the procedures followed in relation to the project which, it was argued in the briefs, constituted substantial compliance with ULURP in any event, and pleaded that when UDC or its subsidiary undertakes a project in cooperation with a municipality compliance with local laws such as ULURP is not required. Special Term, concluding that the UDC’s "override power” made compliance with ULURP unnecessary, dismissed the petitions without reaching the other issues and the Appellate Division affirmed, without opinion.
 

 The thrust of petitioners’ argument as to the compliance with ULURP is that the UDC Act only relieves UDC and its subsidiary of the necessity of complying with local laws, but does not affect the obligation of the city as an active participant in the project to do so. The argument is based upon provisions of the June 27, 1980 Memorandum of Understanding between the city and UDC and the Board of Estimate resolution. The memorandum outlines the parties’ intention "to cooperate in the preparation and implementation of a plan for the redevelopment of the area around 42nd Street in Manhattan,” states that the area’s redevelopment "can best be carried out by cooperation between the City and UDC” and characterizes the project as a "joint effort.” Under it the city agreed to identify goals and priorities and the parties agreed to act jointly in preparing a development program and selecting qualified developers. Implementation of the development program was, however, to be the responsibility of UDC, which agreed to exercise its statutory powers in carrying it out. The memorandum provided for eventual submission of the development program by the Mayor to the Board of Estimate for its approval.
 

 That approval was given in the November 9, 1984 resolution. The resolution recited that the project "is in the best interest of the City in that it will remove blight and physical, economic and social decay”, that "in cooperation and after
 
 *354
 
 consultation with the City” pursuant to section 16 of the UDC Act "the City desires that UDC undertake the Project” and that "UDC is undertaking the Project as a land use improvement project as defined” in the UDC Act. Its operative paragraphs adopted and concurred in the UDC findings with respect to the project, in its own findings determined that the project would "be feasible only if undertaken by UDC in accordance with the UDC Act,” and authorized the execution on behalf of the city of contracts with the UDC and developers, provided they contain provisions deeding a presently vested future interest to the city to become absolute at the option of either the city or the UDC upon completion of improvements on a site, upon termination of a lease or upon transfer of UDC’s interest in a site without the city’s consent. Included in those conditions were that rents payable under the leases be assigned, subject to reimbursement of UDC expenses, to the city; that the city have the right as third-party beneficiary to enforce UDC’s rights under any agreement; and that UDC consult with the Mayor prior to exercising its powers of condemnation or its superseding of the building code or zoning or other city regulation in connection with the project.
 

 We conclude that, notwithstanding the city’s presently vested future interest and its substantial role in the planning and implementation of the project, ULURP is not applicable to the city’s participation in the project and need not be complied with. We, therefore, affirm.
 

 II
 

 ULURP requires that upon the filing of proposals for land use activity of specified types with the Department of City Planning the proposal be forwarded to the appropriate Community Board (New York City Charter § 197-c [c]). A Community Board is composed of not more than 50 persons who reside or have a business, professional or other significant interest in the particular Community District (New York City Charter § 2800). Community Districts coincide as far as possible with the historic communities from which the city has developed (New York City Charter § 2701 [b] [1]). The Board is authorized to hold hearings, prepare plans for the improvement and development of its district and cooperate with and advise city agencies and officials (New York City Charter § 2800 [d]).
 

 
 *355
 
 Upon receipt of a land use proposal a Community Board has 60 days within which to conduct a public hearing and submit its written recommendations to the City Planning Commission. Not later than 60 days thereafter the Commission must reach its own conclusion on the proposal and its determination, if it modifies or disapproves a Board recommendation, "shall be accompanied by a written explanation of its reason for such action” (New York City Charter § 197-c [e]). The Commission’s decision is submitted, in turn, to the Board of Estimate for final action (New York City Charter § 197-c [f]). The Community Board, although it acts in a purely advisory capacity, is, therefore, the means whereby those who live or work in an area affected by a proposal land use are advised of pending proposals and given the opportunity to make known their views.
 

 Despite its salutary and important purpose and the fact that the City Charter has its origin in State statute, ULURP’s provisions will not apply if the Legislature so intends. That it did so intend becomes clear when we examine the UDC Act and its legislative history. Section 16 (3) of the Act (McKinney’s Uncons Laws of NY § 6266 [3]) requires UDC and any of its subsidiaries to "comply with the requirements of local laws, ordinances, codes,
 
 charters
 
 or regulations applicable * * * provided however, that when, in the discretion of the corporation, such compliance is not feasible or practicable” they shall comply with the State Building Code (emphasis supplied). And while the proviso may be read to limit the discretion it endows to matters relating to construction rather than redevelopment proposals, its reference to "charters” is of some importance in relation to subdivision (6) of the same section. That subdivision authorizes UDC to enter into contracts with municipalities "and any municipality * * * is hereby authorized and empowered,
 
 notwithstanding any other law,
 
 to enter into such contractual agreements with the corporation” (emphasis supplied). The two subdivisions being part of the same section — having been enacted in the same breath, so to speak — "any other law” as used in subdivision (6) must be construed in light of subdivision (3)’s reference to "charters” to encompass a charter provision such as ULURP.
 

 What is implied by reading the two subdivisions of section 16 together is made explicit by sections 33 and 34 (McKinney’s Uncons Laws of NY §§ 6283, 6284). Section 33 flatly declares that "[i]nsofar as the provisions of this act are inconsistent
 
 *356
 
 with the provisions of any other law, general, special or local, the provisions of this act shall be controlling” and section 34 directs that the "act, being necessary for the welfare of the state and its inhabitants, shall be liberally construed to effectuate its purposes.”
 
 *
 

 Any ambiguity that remains after consideration of those provisions of the Act is dispelled by its legislative history. Prior to passage of the UDC Act in 1968, the Joint Legislative Committee on Housing and Urban Development held hearings, during one of which, relating to construction costs, it was presented with testimony concerned with the costly delays caused by "the chain reaction of applications, approvals, inspections and overlapping jurisdictions set off by any government financed housing project” (Report of Joint Legis Comm on Housing & Urban Development, 1968 NY Legis Doc No. 81-A, at 20). The Committee’s report noted that New York was falling behind in meeting the problems of urban areas and that the average time for completion of an urban renewal project was approximately 10 years. Its report stated (at 44): "We can no longer tolerate these long and costly delays or the inability to provide much needed housing and jobs. Partially, government is to blame because of the impenetrable layers of bureaucratic red tape it imposes at every level. Partially, local disputes as to how best to carry out a project are to blame. And, importantly, the incentives to attract private developers, particularly in the face of these obstacles, have been lacking.” That sentence was echoed by Governor Rockefeller in his Special Message to the Legislature in support of the 1968 legislation (1968 McKinney’s Session Laws of NY, at 2359): "What, then, is the reason for these long and costly delays? Partially, government is to blame because of the impenetrable layers of bureaucratic red tape it imposes at every level. Partially, petty politics at local levels is to blame. And importantly, the incentives to attract private developers, particularly in the face of these obstacles, has been lacking.” (1968 McKinney’s Session Laws of NY, at 2359.)
 

 In sum, the "override power” as it is sometimes referred to
 
 (see, People v Miceli,
 
 73 Misc 2d 133, 140) in the UDC Act is
 
 *357
 
 not limited to regulatory provisions which would otherwise govern UDC’s activity but encompasses as well the provisions which would otherwise govern the activity of a municipality contracting with UDC with respect to a redevelopment project, whether the municipality’s cooperation is characterized as a participant, joint venturer or partner, and even though the city has a future vested interest and is expected to be the ultimate owner.
 

 Indeed, we held as much, although in a different context, in
 
 Wein v Beame
 
 (43 NY2d 326). There the question was whether the UDC project for renovation of the Commodore Hotel constituted a violation of the constitutional provisions against contracting away the taxing power. Plaintiff’s contention was that the UDC was but a "straw man,” involved in the project solely as a means of providing a tax exemption the city could not grant directly. We held that "the purchase of the hotel by UDC will result in a valid tax exemption by operation of law, regardless of any action or inaction upon the part of the city. This is true whether the plan was originally developed by the city, UDC, or Wembley [a private developer]; and this is so regardless of the extent of actual participation in the project by UDC” (43 NY2d, at pp 331-332).
 

 This is so because if the city is required to comply with ULURP before it can cooperate with UDC and the developers in the Times Square Redevelopment Project, the project will be impeded just as directly as if UDC itself were subject to such requirements. The Legislature, by providing in section 4 (7) (McKinney’s Uncons Laws of NY § 6254 [7]) for the establishment by UDC of community advisory committees and in section 16 (McKinney’s Uncons Laws of NY § 6266 [2]) for public hearings, has provided the land use review procedures it deemed warranted with respect to redevelopment projects undertaken by UDC (and, indeed, under those procedures the Community Advisory Boards which under ULURP would review the Times Square project have been informed and have participated). It has done so in order to reduce "the impenetrable layers of red tape,” which would not be the case were the largely duplicative ULURP procedures required to be carried out by the city before it could engage in the cooperative activity which the UDC Act clearly contemplated it would. And the Legislature had the authority to do so because, to paraphrase what we said in
 
 Floyd v New York State Urban Dev. Corp.
 
 (33 NY2d 1, 7), urban redevelopment is a matter of State-wide concern and since the UDC Act affects
 
 *358
 
 such redevelopment, it follows that neither local laws nor City Charter provisions in conflict may inhibit the operation of the Act.
 

 For the foregoing reasons, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Hancock, Jr., concur.
 

 Order affirmed, with costs.
 

 *
 

 One of those purposes is "to promote the sound growth and development of our municipalities through the correction of such substandard, unsanitary, lighted, deteriorated or deteriorating conditions, factors and characteristics by the clearance, replanning, reconstruction, rehabilitation * * * of such areas” such as the Times Square Redevelopment Project (UDC Act § 2, McKinney’s Uncons Laws of NY § 6252).