OPINION OF THE COURT
Herbert A. Posner, J.
Defendants, Mayor Rudolph Giuliani (Giuliani), the New York City Health and Hospitals Corporation (HCC) and the New York City Economic Development Corporation (NYCED), have moved for summary judgment. Plaintiffs in action No. 1, the Council of the City of New York (Council) and its principal leaders, and plaintiffs in action No. 2, the Campaign to Save Our Public Hospitals (Campaign), have cross-moved for summary judgment.
The conflict between the Mayor of the City of New York and the Council of the City of New York is founded upon the age-old controversy between the executive and legislative branches of government. Fortunately, unlike the resolution adopted by the protagonists (Cassius and Brutus) in Shakespeare’s "Julius Caesar”, the authors of our State and Federal Constitutions *895 have wisely established the third branch of government as arbiter of disputes between the two.
Plaintiffs in both actions originally petitioned the court for a declaratory judgment interpreting section 7385 (6) of McKinney’s Unconsolidated Laws of NY (New York City Health and Hospitals Corporation Act § 5 [6]; L 1969, ch 1016, § 1, as amended). This section of the New York City Health and Hospitals Corporation Act (HHC Act) subjected the HHC’s power to sell or lease its health facilities to the approval of the Board of Estimate. When the Board of Estimate was abolished by the new New York City Charter of 1989, no specific language was included to indicate which person or entity inherited this particular power previously exercised by the Board of Estimate. Furthermore, the New York State Legislature has failed to exercise its power to amend the statute substituting a specific officer or body to succeed the Board. (See, 1995 NY Assembly Bill A 8896; 1995 NY Assembly Bill A 11048.) Defendant Giuliani claims that the new Charter intended that he alone should exercise that power. Plaintiffs contend that the new Charter gives the power to the Council acting in conjunction with the Mayor.
On November 8, 1996, the Board of Directors of defendant HHC voted to empower the HHC’s president to execute a lease with a for-profit corporation. Said lease in effect turns over the operation of Coney Island Hospital in toto to the lessee for eight generations (198 years). As a result of this action, plaintiffs amended their complaints alleging that HHC exceeded its statutory powers.
Mayor Giuliani has sought numerous ways to bring the City’s expenses in balance with its revenue. One of his proposals is for the privatization of the City’s public hospitals — a continuous drain on the City’s resources. It is his belief that a private for-profit corporation can more efficiently run the City’s hospitals. Whether the plaintiffs agree or disagree with this philosophy is not the issue. Nor is the debate over that philosophy one in which the court has any right or power to immerse itself.
Prior to 1970, in compliance with the constitutional requirement that government protect and promote public health (NY Const, art XVII, § 3), the City of New York constructed, maintained and operated hospital facilities providing care to residents of the City, including those persons who could not otherwise afford hospital services. In 1969, the New York State Legislature enacted the New York City Health and Hospitals *896 Corporation Act, creating the HHC and authorizing the City to transfer the municipal hospitals to HHC for the purpose of continuing to fulfill the constitutional mandates (McKinney’s Uncons Laws of NY § 7381 et seq. [HHC Act § 1 et seq.]; L 1969, ch 1016, § 1).
HHC’s mission is to ensure the provision of "high quality, dignified and comprehensive” care to the ill and infirm of the City, and particularly those persons who can least afford such services (see, McKinney’s Uncons Laws of NY § 7382). HHC was established at the behest of the City in part to permit independent financing of municipal hospital construction and improvements and to facilitate professional management of the hospital system. HHC’s creation was intended to overcome the "myriad of complex and often deleterious constraints” which inhibited the provision of care by the City in its own operation of the municipal health system (McKinney’s Uncons Laws of NY § 7382). To effect that goal, the Legislature gave HHC a number of powers designed to provide the "legal, financial and managerial” flexibility necessary to carry out its purpose (McKinney’s Uncons Laws of NY §§ 7382, 7385). It was authorized "[t]o make and to execute contracts and leases and all other agreements or instruments necessary or convenient for the exercise of its powers and the fulfillment of its corporate purposes” (McKinney’s Uncons Laws of NY § 7385 [5]). In addition, HHC was granted the power "[t]o provide health and medical services for the public directly or by agreement or lease with any person, firm or private or public corporation or association, through and in the health facilities of the corporation”. (McKinney’s Uncons Laws of NY § 7385 [8].)
Nevertheless, some of the powers conferred on HHC were constrained, and in some instances, subject to direct oversight and continuing control by the City.[1] Among these powers was the power relevant to the issues herein: "To * * * dispose of by sale, lease or sublease, real * * * property, including but not limited to a health facility, or any interest therein for its corporate purposes; provided, however, that no health facility or other real property acquired or constructed by the corporation shall be sold, leased or otherwise transferred by the *897 corporation without public hearing by the corporation after twenty days public notice and without the consent of the board of estimate of the city” (McKinney’s Uncons Laws of NY § 7385 [6] [emphasis added]).
On July 1, 1970, in accordance with the HHC Act, the City and HHC entered into an agreement under which HHC agreed to assume responsibility for maintaining and operating the City’s public hospitals. Eleven hospitals, included under that agreement, have continued in operation since 1970.
In 1994, the City, through the Mayor’s office, began exploring the possibility of transferring the operation of three of those hospitals, Coney Island Hospital (CIH), Elmhurst Hospital Center and Queens Hospital Center (the Queens Health Network) to private entities.
On June 26, 1996, the City and PHS New York Inc. (PHS-NY) executed a letter of intent calling for negotiations to achieve a long-term sublease of property, plant and equipment of CIH to PHS-NY, and a contract for PHS-NY to operate CIH as a community-based, acute care in-patient hospital during the term of the sublease. Following a public hearing, the HHC Board of Directors, on November 8, 1996, authorized and approved the sublease of CIH to PHS-NY for an initial term of 99 years (and renewable by PHS-NY for an additional 99-year term). The sublease is rather unusual in that it recites those service obligations being imposed upon PHS-NY, including that PHS-NY take over HHC’s operation of the hospital services and provide access to health care to indigent persons, in addition to the more typical tenant obligations.
Both plaintiffs claim that (1) any sale, transfer, lease or sublease of any HHC facilities to private lessees requires the approval of the Council pursuant to McKinney’s Unconsolidated Laws of NY § 7385 (6); (2) any such disposition requires the application of and compliance with the Uniform Land Use Review Procedure (ULURP) process of sections 197-c and 197-d of the New York City Charter. The coalition plaintiffs also originally claimed that defendants violated section 197-b of the Charter by failing to submit their plans for privatizing the hospitals to the New York City Planning Commission and affected community boards and borough presidents. The parties have stipulated to permit plaintiffs in action Nos. 1 and 2 to amend their respective complaints to add a cause of action against HHC asking the court to void HHC’s action on November 8, 1996 as an ultra vires act.
*898 Defendants in their amended answers assert affirmative defenses based upon section 7385 (6) and (8) of McKinney’s Unconsolidated Laws of NY.
THE BOARD OF ESTIMATE ISSUE
The HHC Act expressly provides that the HHC may "dispose of by sale, lease or sublease, real or personal property, including but not limited to a health facility, or any interest therein for its corporate purposes” (McKinney’s Uncons Laws of NY § 7385 [6] [emphasis supplied]). Such provision goes on to condition the exercise of that power upon the consent of the Board of Estimate of the City.
At the time of the passage of the HHC Act, the Board of Estimate consisted of eight elected members: the Mayor, the City Comptroller, the president of the City Council and the five borough presidents. Each of the City-wide officers had two votes and each of the borough presidents had one vote. This voting distribution of the Board of Estimate members was declared violative of the constitutional requirement of one person, one vote (see, Morris v Board of Estimate, 592 F Supp 1462 [ED NY 1984], affd 831 F2d 384, affd 489 US 688 [1989]).
As a consequence of such ruling, the New York City Charter Revision Commission was formed, with one of its objectives for Charter revision being to build greater participation in policy debates and decisions (see, Final Report of NY City Charter Rev Commn — Jan. 1989-Nov. 1989, at 4). Following the enactment (at the Nov. 7, 1989 general election) of sweeping Charter amendments proposed by the Commission, the Board of Estimate was abolished and its power distributed elsewhere.
Notwithstanding the abolition of the Board of Estimate, the requirement that the Board of Estimate give its consent to any transfer of a health facility or real property by HHC remains "on the books” (McKinney’s Uncons Laws of NY § 7385 [6]) and the Legislature has not taken the opportunity to amend it. However, the failure of the Legislature to amend the section does not mandate a conclusion that it prefers a statutory construction severing the consent portion as obsolete. In fact, the contrary is true. The Legislature, by not having acted to eliminate the "board of estimate” language, can be said to have opted to allow the consent power to devolve upon the body, agency or officer designated in the revised Charter to succeed to the powers of the Board of Estimate. The Charter itself contemplates this result.
Section 1152 (e) of the Charter, adopted by the voters in 1989, as part of the Charter revisions, in relevant part, *899 provides: "the powers and responsibilities of the board of estimate, set forth in any state or local law, that are not otherwise devolved by the terms of such law, upon another body, agency or officer shall devolve upon the body, agency or officer of the city charged with comparable and related powers and responsibilities under this charter, consistent with the purposes and intent of this charter”. (Emphasis supplied.)
By applying such "savings” provision to the HHC Act, the original intent of the Legislature (to allow a check on HHC’s power to lease or transfer a health facility or real property) may be accomplished (see, McKinney’s Cons Laws of NY, Book 1, Statutes §§ 391-392, 397; see also, Matter of New York Pub. Interest Research Group v Dinkins, 83 NY2d 377, 386; Matter of Natural Resources Defense Council v New York City Dept. of Sanitation, 83 NY2d 215, 222; Ball v State of New York, 41 NY2d 617, 622). Moreover, none of the parties involved herein claim that no consent by a city agency, body or officer is required. This court concludes that section 7385 (6) of McKinney’s Unconsolidated Laws of NY must be construed to continue to require consent; the question to be resolved is which body, agency or officer, or combination thereof, has succeeded to the Board of Estimate in this regard.
The Council plaintiffs urge that the consent power granted the Board of Estimate in McKinney’s Unconsolidated Laws of NY § 7385 (6) has devolved upon both the Council and the Mayor. They point to the fact that the powers to consider land use effects and business terms have been split under the Charter revisions between the Council, under section 197-c of the Charter (ULURP), and the Mayor, under section 384 (a) of the Charter, respectively (see, Tribeca Community Assn. v New York State Urban Dev. Corp., Sup Ct, NY County, index No. 20355/92, affd 200 AD2d 536, appeal dismissed 83 NY2d 905, Iv denied 84 NY2d 805). They also contend that neither the HHC Act nor the Charter restricts the Council to ULURP considerations only.
Defendants argue that because at the time of the HHC Act’s enactment, the Board of Estimate had the right to consider business terms under the then Charter § 384 (a) and ULURP did not yet exist, the Legislature intended that the Board of Estimate be relegated to consideration of the business terms only of any sale or lease of property held by HHC. According to defendants, such consideration of business terms has been assigned to the Mayor exclusively pursuant to section 384 of the Charter, and the Council has no role in the consent power of McKinney’s Unconsolidated Laws of NY § 7385 (6).
*900 The HHC Act, however, did not provide guidelines or limits on the type of issues the Board of Estimate could take into consideration when exercising the consent power. By its silence, the Act granted the Board of Estimate full authority to contemplate at least those issues usually associated with property disposition, including business terms and land use effects.
Defendants further argue that the Council has no land use review role under the consent power of McKinney’s Unconsolidated Laws of NY § 7385 (6) because ULURP, as the mechanism for the Council’s exercise of land use review, is inapplicable to HHC. According to defendants, the HHC Act supersedes any Charter provision regulating its power to sublease, citing Matter of Waybro Corp. v Board of Estimate (67 NY2d 349).
Waybro (supra), however, is distinguishable from this case, because unlike the statute at issue therein (McKinney’s Uncons Laws of NY § 6251 et seq. [New York State Urban Development Corporation Act § 1 et seq.; L 1968, ch 174, as amended]), nothing in the HHC Act indicates HHC has the authority to override requirements of the local Charter in relation to disposition of health facilities or property (see, Matter of Waybro Corp. v Board of Estimate, supra, at 355; see also, Connor v Cuomo, 161 Misc 2d 889, 896). The HHC Act, by requiring consent of the Board of Estimate under McKinney’s Unconsolidated Laws of NY § 7385 (6) for dispositions of property, expresses, if anything, the contrary intent. Similarly, if this court was to adopt defendants’ reasoning, then it would have to hold that the HHC Act supersedes even Charter § 384 (a), the Charter provision granting the Mayor the power to review business terms of dispositions of City property. To the extent the parties agree on anything, they agree that this section gives the Mayor the power to review business terms of dispositions of City property, including the HHC sublease.
Section 384 (a) of the Charter provides: "No real property of the city may be sold, leased, exchanged or otherwise disposed of except with the approval of the mayor and as may be provided by law unless such power is expressly vested by law in another agency. ” (Emphasis added.) The section’s language granting the Mayor the approval power, however, includes the conjunctive "and”, followed by "as may be provided by law unless such power is expressly vested by law in another agency.” The phrase "as may be provided by law” can be read without strain or force to include ULURP wherein the power to review sales, leases and other dispositions of real property of the City is bestowed upon the Council (see, NY City Charter §§ 197-c, 197-d).
*901 ULURP was enacted in 1975, "in response to a perceived need for informed local community involvement in land use planning, for adequate technical and professional review of land use decisions and for final decision-making by a politically accountable body, the City’s Board of Estimate.” (2 Morris, New York Practice Guide: Real Estate § 20.04, at 20-47.) In its final report, the Charter Revision Commission indicated that prior to the 1989 revision of the Charter, the Board of Estimate had "final authority over land use decisions” and the Council "had no role in the land use review process” (Final Report of NY City Charter Rev Commn — Jan. 1989-Nov. 1989, at 7, 19, respectively). It noted that "[t]he basic change made by the 1989 charter amendments was to substitute the Council for the Board as the final decision maker in land use,” and that "because racial and language minority groups will enjoy greater representation on the Council than they have had on the Board, they will be able to exert more influence if there is conflict with the mayor on a land use matter” (id., at 20-21).
ULURP, as revised, in pertinent part, provides:
"§ 197-c. Uniform land use review procedure, a. Except as otherwise provided in this charter, applications by any person or agency for changes, approvals, contracts, consents, permits or authorization thereof, respecting the use, development or improvement of real property subject to city regulation shall be reviewed pursuant to a uniform review procedure in the following categories * * *
"(10) Sale, lease (other than the lease of office space), exchange, or other disposition of the real property of the city” (Charter § 197-c [emphasis supplied]).
HHC has been held not to be an "agency” of the City (see, Brennan v City of New York, 59 NY2d 791, 792), and the term "person” is not specifically defined in Charter § 197-c, or in the Administrative Code of the City of New York concerning land use topics. Nevertheless, section 197-c of the Charter should be liberally construed (see, Mauldin v New York City Tr. Auth., 64 AD2d 114, 117), and thus, HHC, as a public benefit corporation, may be considered a "person” for the purposes of ULURP (see, General Construction Law §§ 37, 65).
As for the meaning of "disposition”, the term is not defined by statute, charter or code provision. The word has been defined as the "[a]ct of disposing; transferring to the care or possession of another. The parting with, alienation of, or giving up property” (Black’s Law Dictionary 471 [6th ed 1990]). By applying this definition, the court finds the sublease of CIH *902 constitutes a "disposition” under ULURP because it is a transfer of a real property interest, as well as service duties from HHC to PHS-NY.
Defendants further argue that even assuming ULURP evinces the partial devolvement of the consent power under McKinney’s Unconsolidated Laws of NY § 7385 (6) to the Council, it cannot actually apply to the CIH sublease because ULURP violates section 10 (5) of the Municipal Home Rule Law. The Court of Appeals has interpreted section 10 (5) to provide that public benefit corporations are exempt only from regulations which would interfere with their purpose (see, Matter of Levy v City Commn. on Human Rights, 85 NY2d 740). Again, it is the HHC Act itself which grants a check on HHC’s authority to dispose of real property, albeit via the Board of Estimate, now a nonexistent body. As explained above, the consent power of the Board of Estimate under section 7385 (6) has devolved to both the Council and the Mayor. Hence, ULURP must be viewed as not impairing the exercise of HHC’s power to dispose of property by sublease.
Defendants alternatively contend ULURP is inapplicable because the sublease of CIH is not the subject of any disposition by the City, but instead, a disposition by HHC. They argue that under traditional notions of property law, a lessee is free to exercise possession and control over the property as against the world, including the landlord. Charter § 197-c, however, is not restricted to dispositions by the City, but instead, is applicable to any dispositions of the real property of the City.
THE ULTRA VIRES ISSUE
The primary issue presented is whether the subleasing of CIH, along with the wholesale turnover of HHC’s service obligations, constitutes an ultra vires act in violation of the HHC Act.
As Mayor Lindsay, pledged to the State Legislature, in his letter to Governor Nelson A. Rockefeller, "'[i]n establishing a public benefit corporation, the City is not getting out of the hospital business. Rather it is establishing a mechanism to aid it in better managing that business for the benefit not only of the public served by the hospitals but the entire City health service system. The municipal and health care system will continue to be the City’s responsibility, governed by policies, determined by the City Council, the Board of Estimate, the Mayor, and the Health Services Administration on behalf of and in consultation with the citizens of New York City.” (Let *903 ter of Mayor John V. Lindsay, Bill Jacket, L 1969, ch 1016 [emphasis added].) The Legislature, by enacting the HHC Act, chose to rely upon such pledges and created HHC, a public benefit corporation, to carry out the City’s constitutional responsibilities.
HHC, by contracting with PHS-NY by means of a 99-year sublease, to have PHS-NY take over the operation of CIH, is shirking its own statutorily imposed responsibility, without the Legislature’s approval. Although the HHC Act concededly allows for provision of health and medical services "by agreement or lease with any person, firm or private or public corporation or association, through and in the health facilities of [HHC] and to make rules and regulations governing admissions and. health and medical services” (McKinney’s Uncons Laws of NY § 7385 [8]), such allowance may not be construed to permit the incongruous result that HHC can delegate or shift all of its responsibilities to a nonpublic entity as a means of "furthering its corporate purposes.” (See generally, McKinney’s Uncons Laws of NY § 7385 [8].) Moreover, that reading would frustrate the purposes and obligations of the HHC to the people of the City (see, Matter of New York Pub. Interest Research Group v Dinkins, 83 NY2d 377, supra [City officials cannot frustrate a legislative purpose by eviscerating an agency or group created by statute for a public purpose]; Matter of Gallagher v Regan, 42 NY2d 230, 234 [" 'a legislative act of equal dignity and import’ ” is required to modify a statute, and " '(n)othing less than another statute will suffice’ ”]).
This situation is inherently different from one in which a particular hospital property is no longer needed, usable or affordable, requiring its closure by HHC (see, Matter of Green-point Renaissance Enter. Corp. v City of New York, 137 AD2d 597; Jackson v New York City Health & Hosps. Corp., 419 F Supp 809; see also, Bryan v Koch, 627 F2d 612, affg 492 F Supp 212), or even one in which a specific portion or service of a health facility is leased, subcontracted or merged by HHC with a view to saving costs or improving delivery of care. For in each of those instances, HHC maintains the reins of control and decision-making, and does not leave both the administration and day-to-day operation entirely to someone else.
Put another way, HHC cannot put itself out of business in relation to CIH by subleasing all of its assets and transferring all of its duties, without the consent of the Legislature, any more than a private corporation, by its Board of Directors, could divest itself of its assets and property without permission of its shareholders (see, Business Corporation Law § 909 [a]; Dukas v Davis Aircraft Prods. Co., 131 AD2d 720, 721).
*904 The evidence presented on these motions makes it clear that defendants seek to privatize all the HHC hospitals. It is also obvious that the "turning over” of CIH to a nonpublic corporation is the first step towards defendants’ ultimate goal of disengaging the City from the municipal hospital system and placing municipal hospital services in the hands of an outsider or the private sector.[2] At the least, defendants seek to "downsize” HHC and minimize its role (and therefore the City’s role), for an examination of the sublease terms reveals such limited retained control by HHC as to raise the question of whether HHC’s continued existence could be justified if such subleasing is repeated in connection with the other HHC hospitals. For example, the sublease provides an arbitration process in the event PHS-NY wishes to discontinue a core service, by which an arbitration award can become binding on HHC. The Legislature cannot possibly have intended or expected that by granting HHC the right to enter into agreements or leases, HHC would be put into a position where HHC’s Board of Directors essentially stripped the corporation of its control over the carrying out of its duties.
The history of the creation of HHC is instructive. HHC was born out of the City’s need to salvage a hospital system nearly drowning in red ink. Defendants’ response cannot be simply to jump ship. They must go back to the Legislature, and seek an amendment or repeal of the HHC Act, or devise some other plan for managing the crisis.
By finding that HHC has committed an ultra vires act in entering into a sublease to privatize CIH, this court is not attempting to second guess HHC or the other defendants or to substitute its own beliefs for that of the HHC Board of Directors. Instead, it is holding that HHC must give meaning to the intent of the People as expressed through the State Legislature’s enactment of the HHC Act.
Accordingly, the summary judgment motions by defendants in action Nos. 1 and 2 are denied. The cross motions for summary judgment by the Council plaintiffs in action No. 1 and by the Campaign plaintiffs in action No. 2 are granted to the extent of declaring that the subleasing of HHC facilities requires the application of ULURP and the approval of the *905 Council, and further declaring that the sublease of CIH to PHS-NY constitutes an ultra vires act and violates the HHC Act.
[Portions of opinion omitted for purposes of publication.]

. See, e.g., McKinney’s Uncons Laws of NY § 7386 (1) (a); HHC submits its program budget to the City in time for inclusion in the Mayor’s executive budget and culminates in the City budget which the City Council has the sole authority to adopt; see also, McKinney’s Uncons Laws of NY § 7386 (2) (b); (7); § 7390 (5)-(8); § 7385 (19).

. "Mayor Rudolph Giuliani recently announced plans to sell Coney Island Hospital and two other Queens hospitals into private hands. Giuliani said he was worried about rising health-care costs and deficits at city-owned hospitals, and wants to get the city out of hospital business. ” (Newsday, Mar. 5, 1995 [emphasis supplied].)