■ In the Matter of JONATHAN GREENBERG et al., Respondents, v CITY OF NEW YORK et al., Appellants. [832 NYS2d 16]—

Order, Supreme Court, New York County (Emily Jane Goodman, J.), entered August 2, 2006, which granted the petition to enjoin the City from commencing certain aspects of its proposed plan to renovate and redesign Washington Square Park pending de novo review by Community Board 2, the Landmarks Preservation Commission and the Art Commission, respectively, unanimously reversed, on the law, without costs, the petition denied and the proceeding dismissed.

In this CPLR article 78 proceeding, petitioners, four residents of Greenwich Village, allege that the New York City Parks Department unlawfully failed to disclose material information concerning its proposed plan to renovate Washington Square Park to Community Board 2, the Landmarks Preservation Commission and the Art Commission. According to petitioners, the Parks Department's failure to provide complete and accurate information at each step of the review process effectively deprived the Community Board and the Commissions of their statutory review responsibilities, and that de novo review is the appropriate remedy.

Washington Square Park occupies approximately 9.75 acres of land at the southern end of Fifth Avenue in Greenwich Village. It is designated as a New York City landmark. The Park also falls within the neighborhood represented by Community Board 2. Near the center of the Park lies a fountain basin and surrounding plaza (fountain plaza) that are renowned as gathering places for political and social protests, as well as artistic and entertainment performances. Because the Park has been in a state of disrepair for decades, in 2003 the New York City Parks Department began developing a comprehensive plan to renovate it. The general plan included, among other things, restoration and relocation of the fountain in order to align it with the Washington Square Arch, restoration and relocation of two statues in the Park, landscape adjustments aimed at improving drainage, construction of a four-foot perimeter fence, and installation of a new field house and comfort stations.

This litigation focuses on those aspects of the renovation plan that call for changes to the fountain basin and fountain plaza. The fountain basin is a circular, sunken area that has the actual fountain in the middle, and is surrounded by steps that serve as a seating area. The fountain plaza is a wider, paved area that rings the fountain basin and is slightly below grade from the

rest of the Park. The proposed renovation of these two areas includes the repair of the fountain's plumbing system, restoration of the fountain's jet pressure and the addition of two side jets, restoration of the fountain plaza to grade level and a reshaping and decreasing of the size of the fountain plaza.

In December 2003, the Parks Department presented a preliminary plan for the Park's renovation to Community Board 2, which subsequently issued a unanimous resolution endorsing the concept to refurbish the Park. During the next year, the Parks Department designer and other Department employees made themselves available both at the Park and at other public meetings to discuss the proposed renovations.

In April 2005, the Parks Department presented more detailed plans to Community Board 2 that included pictures and schematic diagrams of the proposed changes. The schematic drawings included no specific measurements, but were drawn to scale. Some of the drawings depicting the renovated fountain showed a fountain stream that would reach the interior height of the Washington Square Arch, which is approximately 45 feet. By resolution dated April 21, 2005, Community Board 2 endorsed the planned renovation, conditioned on the Parks Department working with City Councilmember Alan Gerson to resolve issues such as the location of the dog run and the design of the playgrounds. The resolution further stated that although the Community Board generally supported increased lawn areas, "these new areas should not be created at the expense of existing uses including dog runs, playgrounds, game tables, and areas for formal and informal performances."

On May 10 and 17, 2005, the Parks Department presented its renovation plan to the Landmarks Preservation Commission at a public meeting and hearing, submitting the same schematic drawings of the renovated park and fountain that were presented to the Community Board. On May 17, 2005, the Landmarks Preservation Commission approved the plan, subject to certain conditions respecting the perimeter fence and building materials, as well as review of final construction plans.

On October 6, 2005, Councilmembers Alan Gerson and Christine Quinn sent a letter to Parks Department Commissioner Adrian Benepe stating that in consideration of the "understanding" reached between them "as to fundamental assurances and a framework for resolving the outstanding major issues pertaining to the renovation of Washington Square Park," the councilmembers pledged to support the release of city funds for the renovation. Included among the approximately 30 "points of agreement" listed in the letter was that the total

square footage of the renovated fountain plaza would be "no less than 90% of its current size."

On the same date as the above letter, Community Board 2's Parks Committee met with Councilmember Gerson regarding the controversy over the Park renovation plan and the alleged agreement reached by the councilmembers with the Parks Department. After the meeting, the Parks Committee passed a resolution that opposed raising the fountain plaza to street level and opposed any reduction in the size of the fountain plaza.

However, on October 31, 2005, the full Community Board 2 met and adopted a resolution reaffirming its April 2005 approval of the plans and advocating the start of phase 1 of the renovation work as soon as possible. Although this resolution specifically endorsed many of the specific items "negotiated" by Councilmembers Gerson and Quinn, the "agreement" limiting the reduction of the fountain plaza to 10% was not included among the listed items.

On January 9, 2006, the Parks Department presented its plan at a public hearing before the Art Commission. The same schematic drawings were included in the presentation. In addition, however, the Parks Department included a slide show that revealed the grade level changes of the fountain plaza and the proposed dimensions of the fountain. The Art Commission approved the proposed renovations in three separate resolutions. The Art Commission's approval of the fountain renovation was contingent upon further study of the "height, placement and acoustic impact of the water jets and viewing a mock-up on site."

In April 2006, petitioners commenced the instant article 78 proceeding seeking to annul the approval of the renovation plans by Community Board 2 and the two Commissions on the ground that the Parks Department acted in violation of lawful procedure by withholding material information regarding the planned renovation of the fountain and fountain plaza. Specifically, petitioners allege that the Parks Department's intention to reduce the fountain plaza area by 33% and to install a 45-foot jet spray in the fountain were never disclosed to either the Community Board nor the Landmarks Preservation Commission, but instead were first mentioned in the proceedings before the Art Commission. They further allege that a Parks Department employee deliberately misrepresented the plan to reduce the size of the plaza to the Landmarks Preservation Commission and that the Department further violated the terms of the Gerson-Quinn agreement.

In its answer, the City denied that the Parks Department

withheld material facts from the Community Board or either Commission. In support, the Department's Deputy Commissioner for Capital Projects submitted an affidavit stating that an approximately 20% increase in green space (and concomitant 20% decrease in paved plaza space) was contemplated from the beginning of the project. The Deputy Commissioner further asserted that the pictures and schematic drawings submitted with the renovation plans adequately disclosed the proposed decrease in plaza size and increase in the capacity of the fountain jets. Finally, the City argued that to the extent that the Community Board's review of the renovation plans was legally required, such authority was merely advisory in nature since the Board does not have approval power over such a project.

In the order appealed from, Supreme Court granted the petition to the extent of enjoining the renovation of the fountain and plaza and directing the Parks Department to resubmit the complete renovation plans to Community Board 2, the Landmarks Preservation Commission and the Art Commission for de novo review. The court explained that two "essential aspects" of the plans, to wit, the decrease in size of the fountain plaza and the increased capacity of the fountain jet, were not adequately revealed to the Community Board or the Landmarks Preservation Commission, effectively depriving them of their oversight role. The court rejected respondents' argument that the pictures or schematic drawings were sufficient, by themselves, to alert the reviewing entities of the proposed changes to the fountain and plaza.

On appeal, the City argues that the motion court erred in finding that the Parks Department violated lawful procedure by withholding material information from the Community Board since submission of the renovation plan to the Board was not legally required in the first instance and, even if it was, the Board's role is merely advisory. In addition, the City contends that neither the precise decrease in size of the fountain plaza nor the maximum height of the fountain stream were material aspects of the comprehensive renovation plan and that, in any event, both aspects of the plan were adequately disclosed during the review process. We agree with the City that the Parks Department's disclosures were adequate under the circumstances to permit the Community Board and the Commissions to fulfill their statutory review functions. Accordingly, we reverse and deny the petition.

Initially, we reject the City's threshold argument that the Parks Department was not legally required to submit the renovation plan to Community Board 2 for review. Pursuant to New

York City Charter § 2800 (d) (17), each community board is required to "[e]xercise the initial review of applications and proposals of public agencies and private entities for the use, development or improvement of land located in the community district, including the conduct of a public hearing and the preparation and submission to the city planning commission of a written recommendation." Petitioners argue that paragraph (17) is inapplicable here because the planned renovation does not constitute a "use, development or improvement of land," and because it is conceded by all parties that the City Planning Commission has no role in reviewing this project. The City's reading of this Charter provision is not tenable, since several aspects of the renovation project, including the construction of a perimeter fence, new fountain and children's playground easily fit within the statutory definition of "use" or "improvement" of land. Thus, we find that section 2800 (d) (17) is applicable herein and requires review by the Community Board, notwithstanding the reference to the City Planning Commission.

Nevertheless, the City is correct in arguing that the Community Board's role in the review process is merely advisory. No provision of the City Charter or Administrative Code vests a community board with approval power over park development projects such as the instant one (*see generally* NY City Charter § 2800 [d]). On the contrary, the Court of Appeals has described a community board's role in the land use planning process as a "limited advisory" one (*Community Bd. 7 of Borough of Manhattan v Schaffer*, 84 NY2d 148, 159 [1994]; *see also Shubert Org. v Landmarks Preserv. Commn. of City of N.Y.*, 166 AD2d 115, 118 [1991], *lv denied* 79 NY2d 751 [1991], *cert denied* 504 US 946 [1992] [noting that Community Board's approval was "not required as part of the (landmark designation) process"]), and as "the means whereby those who live or work in an area affected by a proposal land use [*sic*] are advised of pending proposals and given the opportunity to make known their views" (*Matter of Waybro Corp. v Board of Estimate of City of N.Y.*, 67 NY2d 349, 355 [1986]).

The limits of a community board's authority are aptly demonstrated by the Court of Appeals decision in *Matter of Coalition Against Lincoln W. v City of New York* (86 NY2d 123 [1995]), where a community board's 35-1 vote to disapprove a large, mixed use development plan for Manhattan's West Side was powerless to stop the plan from ultimately being approved by the City Council. In *Lincoln West*, the petitioners argued that the City Planning Commission had erroneously certified a

developer's application as "complete" for purposes of review by the local community board notwithstanding the late disclosure of a superseding restrictive declaration relating to the property (*id.* at 130). Although the petitioners argued that the late disclosure "would eviscerate meaningful Community Board advisory involvement in the ULURP process" (*id.* at 131), the Court rejected this view on the ground that disclosure of the declaration was not required by applicable law, and thus could not have impaired the Community Board's purely advisory role (*id.* at 132-133). Because the instant petitioners can point to no legal requirement that the precise measurements of the plaza or fountain strength be disclosed, we are unpersuaded by their assertion that the alleged nondisclosures in this case render the approvals of the Community Board and the Commissions ultra vires.

Even if we found that withholding material information from the Community Board might warrant the remedy of de novo review in appropriate circumstances, we would nevertheless find that Supreme Court erred in concluding that the Parks Department provided Community Board 2 with inadequate disclosure in this case. The record demonstrates that apart from the numerous informal discussions regarding the renovation plan both at the park and community forums, in April 2005 the Parks Department made a detailed presentation of the renovation plan to Community Board 2, supported by photographs and schematic drawings of the proposed changes to the fountain and plaza. Although no specific measurements were provided, the diagrams of the plaza were drawn to scale and, consistent with the Parks Department's stated goal, they reflect both an increase in green space and a corresponding reduction in the amount of paved space. In addition, the sketches of the fountain plainly show that its renovated fountain jets would produce a stream of water approaching the interior height of the arch, and thus are sufficient by themselves to constitute notice of the fountain changes. Nor is there any evidence in the record to suggest that the Parks Department either concealed any material information requested by the Board, or that it was even aware that the Board considered the specific measurements of the fountain or plaza to be of such critical importance.

In any event, even assuming the information provided by the Parks Department could objectively be viewed as inadequate, several factors, including evidence of the Board's own deliberations, prove beyond any doubt that the Board considered the issue of the reduction of the plaza size. First, in the Board's April 2005 resolution conditionally approving the plan, the Board

stated that it generally supported increasing lawn areas, but not at the expense of existing uses such as "areas for formal and informal performances." The above-quoted reference strongly suggests that even at this early juncture, concerns over the reduction of the plaza size were being raised before the Board.

Second, the Community Board's awareness of the issue is confirmed by the fact that in October 2005, the Board's own Parks Committee adopted a resolution specifically opposing any reduction in the size of the plaza. Presumably, this resolution was forwarded to the full Community Board, and petitioners fail to explain how the Community Board could have been deprived of material information that is the subject of one of its own committee's recommendations. In any event, the Community Board's October 31, 2005 resolution, which reaffirmed its support for the park renovation plan and implicitly rejected the Park Committee's objections regarding the size of the plaza, is concrete proof that the full Community Board considered the issue.

Third, although the Board's October 31, 2005 resolution states its support for many of the "agreements" negotiated by Councilmembers Gerson and Quinn, omitted from the list of agreements is the condition that the renovated fountain plaza would be no less than 90% of its present size.* Fourth, the mere fact that the Gerson-Quinn letter mentions the issue of reduction of the plaza size is additional proof that the issue was discussed with the Parks Department and was put before Community Board during the review process. Accordingly, petitioners' assertion that Community Board 2 was deprived of material information is belied by the record.

Next, petitioners argue that the Parks Department withheld the same material information from the Landmarks Preservation Commission, requiring de novo review by that body. We disagree. The City concedes that because the Parks Department's plan to renovate Washington Square Park includes "the construction, reconstruction, alteration or demolition of any improvement" of a City-owned landmark site, such plan had to be submitted to the Landmarks Preservation Commission for a report (Administrative Code of City of NY § 25-318 [a]). Here,

---

* Petitioners' characterization of the Gerson-Quinn letter as an "agreement" is misleading, as no representative of the Parks Department either signed the letter or indicated that the Parks Department agreed to be bound by it. In addition, the letter itself, as well as newspaper articles in the record, support the conclusion that many issues, including the size of the fountain plaza, remained unresolved after the negotiations.

the Parks Department complied with this provision by formally submitting its plan to the Landmarks Preservation Commission, accompanied by the same photos and schematic drawings that were presented to the Community Board. Because, as indicated above, the sketches of the fountain clearly show that the renovated central fountain would have substantially increased jet capacity, as well as the installation of two side jets, petitioners claim of inadequate disclosure on this ground is meritless.

Nor was the nondisclosure of the exact size of the decrease of the fountain plaza to the Landmarks Preservation Commission a material omission. The Landmark Preservation Commission's Director of Public Projects submitted an affidavit in opposition stating that the Commission's review was limited to whether the proposed work was appropriate to the significant architectural features of the park and the historic district, such as modification of the park's pathways, the installation and design of a perimeter fence, the leveling of the fountain plaza and the relocation of the fountain. More importantly, the Director also explicitly stated that neither the height of the fountain stream nor the "potential disruption of the public's use of the fountain circle" were considered by the Commission during its review, because such issues were not historic preservation issues but rather a "use issue." In our view, these statements by a director of the Landmarks Preservation Commission are entitled to deference, and clearly demonstrate that these two issues were not material to the Landmark Commission's consideration of the plan (cf. Matter of London v Art Commn. of City of N.Y., 190 AD2d 557, 558-559 [1993], lv denied 82 NY2d 652 [1993] [de novo review by Commission was required where new plan differed materially from prior approved plan]).

Finally, it is also clear that there is no credible claim of inadequate disclosure before the Art Commission. Initially, because the size of the fountain plaza is beyond the Art Commission's review authority (NY City Charter § 854 [a]), any nondisclosure on that issue is necessarily immaterial. However, with respect to the fountain itself and strength of its jets, it is undisputed that the Art Commission has exclusive jurisdiction and approval power over such aspects of the plan because the fountain falls within the statutory definition of a "work of art" (NY City Charter § 854 [a]; § 856 [c]). Nevertheless, the record of the Art Commission's deliberations show that the issue of fountain strength was considered. Indeed, in one of its three January 10, 2006 resolutions, the Art Commission gave preliminary approval over the plan to relocate and update the fountain "subject to

. . . restudying the height, placement and acoustic impact of the water jets and viewing a mock-up on site." Thus, it is clear that the Art Commission deliberated on this very issue and withheld final approval for further study and review.

Accordingly, as we find no basis to annul any of the resolutions or approvals, or to grant de novo review, the petition is denied. Concur—Tom, J.P., Andrias, Saxe, Gonzalez and Sweeny, JJ.